**Richard A. BOLT and Richard A. Bolt, M.D., Plaintiffs-Appellants,**

v.

**HALIFAX HOSPITAL MEDICAL CENTER, et al., Defendants-Appellees.**

Nos. 84–3256, 84–3603.

United States Court of Appeals, Eleventh Circuit.

Aug. 8, 1988.

---

Donald E. Christopher, Orlando, Fla., Clark Havighurst, Durham, N.C., Hal K. Litchford, Litchford, Christopher & Milbrath, P.A., Orlando, Fla., for plaintiffs-appellants.

William E. Loucks, Daytona Beach, Fla., for Volusia County Medical Society.

James E. Slater, Orlando, Fla., for Willis Stose, M.D.

Clinton R. Batterton, David A. Donohoe, Washington, D.C., Harold C. Hubka, Daytona Beach, Fla., for Halifax Hosp. Medical Center.

Ronald L. Harrop, Gurney & Handley, Orlando, Fla., for Roberson and Smith M.D.'s.

McVay Voght, Hannah, Marsee, Beik & Voght, J. Charles Ingram, Orlando, Fla., for Daytona, Humana, Boye, Marino.

Adams & Hill, Janet W. Adams, Orlando, Fla., for Ormond Beach Hosp.

Before TJOFLAT and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

In this case, a physician whose medical staff privileges were revoked at each of three hospitals brought suit against the hospitals, members of their medical staffs, and a local medical society, alleging violations of the federal antitrust laws. The

district court entered directed verdicts for all the defendants, and the physician now appeals. We affirm in part and reverse in part.

## I.

In 1979, Dr. Richard A. Bolt arrived in Daytona Beach, Florida, intending to practice surgery there. Upon his arrival, he applied for staff privileges at three area hospitals, Daytona Community Hospital (DCH), Halifax Hospital Medical Center (HHMC), and Ormond Beach Memorial Hospital (OBMH). DCH is a subsidiary of Humana, Inc., which owns and operates several hospitals throughout the United States. HHMC is operated and funded through a special taxing district of the state of Florida. OBMH is operated as a private, nonprofit organization.

With respect to staff privileges, each hospital's bylaws were essentially the same. Only a physician who had been granted staff privileges could use the hospital's facilities. A physician would receive privileges upon obtaining an "appointment." An appointment lasted for one year; at the end of the year, the physician would be considered for "reappointment" for another one-year term. During the first two appointment terms, the physician would be a probationary member of the medical staff. Then, at the end of the two years, he or she could apply for elevation to active staff membership. When the physician applied for elevation, three outcomes were possible: reappointment and elevation, reappointment for another year without elevation (in which case the physician could apply again for elevation the following year), or denial of reappointment.

The bylaws delineated a specific process for decisions affecting staff privileges, including decisions concerning reappointment and elevation to active staff membership. First, a credentials committee, composed of active staff members, would make a recommendation based on the physician's medical charts and other pertinent information.

That recommendation would be taken up by an executive committee, also composed of active staff members. The executive committee would conduct a more extensive investigation and then reach a decision. If the executive committee reached a decision adverse to the physician under consideration, the physician could appeal to a judicial review committee, which had the discretion to conduct its own investigation; like the credentials and executive committees, the judicial review committee would be composed of active staff members. The recommendations that emerged from the various committees would in every case ultimately be considered by the hospital's governing board, which was responsible for reaching the final decision.

In the fall of 1979, DCH, HHMC, and OBMH each granted Dr. Bolt an initial appointment. Dr. Bolt understood that, pursuant to the bylaws of each hospital, he would remain on probationary status until the fall of 1981, at which time he would be considered for elevation to active staff membership. In the fall of 1979, Dr. Bolt also applied for and was granted provisional membership in the Volusia County Medical Society (VCMS), a local professional organization for physicians.

On September 10, 1981, the DCH credentials committee met to consider whether Dr. Bolt should be reappointed and elevated to active staff membership. In its report to the executive committee, the credentials committee recommended that Dr. Bolt's reappointment be conditioned on his agreement to seek psychiatric counseling through the Impaired Physicians Program, a program operated by the Florida Medical Association. On September 22, the executive committee sustained the credentials committee's recommendation, and notified Dr. Bolt that his name had been forwarded to the Impaired Physicians Program. Dr. Bolt immediately responded that he would not participate in the program, and the executive committee thereafter voted to deny reappointment.[1]

1. Apparently, Dr. Bolt's existing appointment was not yet due to expire, and he therefore continued to admit patients to DCH for some

time after the executive committee's decision. Subsequently, however, the executive committee voted to suspend Dr. Bolt's privileges for the

The day after the DCH executive committee notified Dr. Bolt of its decision to forward his name to the Impaired Physicians Program, the OBMH credentials committee met and voted to recommend that Dr. Bolt be denied reappointment. The OBMH executive committee sustained the credential committee's recommendation on October 27.[2]

Meanwhile, sometime in September,[3] the HHMC credentials committee met and voted to recommend that Dr. Bolt be denied reappointment. The executive committee subsequently voted to sustain the recommendation, and notified Dr. Bolt of its decision on October 13.

Thus, during the months of September and October of 1981, the executive committees at all three hospitals took action against Dr. Bolt. Over the following several months, Dr. Bolt prosecuted appeals at all three hospitals. At HHMC, the judicial review committee found no reason to disagree with the executive committee's decision, and the board of trustees subsequently voted to ratify that decision. At DCH, the judicial review committee did disagree with the executive committee's decision; in fact, it voted to reappoint Dr. Bolt unconditionally. The board of trustees rejected the judicial review committee's decision, however, and ratified the executive committee's decision. Finally, at OBMH, the proceedings before the judicial review commit-

tee were still pending at the time Dr. Bolt instituted this suit, and Dr. Bolt has not pursued those proceedings to their conclusion.

In March 1982, Dr. Bolt filed a complaint in the district court containing federal antitrust claims, federal constitutional claims, federal contract claims, and a variety of pendent state law claims. Named as defendants were DCH,[4] HHMC, OBMH, VCMS, and five physicians: Dr. Richard Boye, Dr. Ralph Marino, Dr. Alvin Smith, Dr. Shedrick Roberson, and Dr. Willis Stose.[5] Each of the individual defendants had played some official role in the privileges decision at one of the hospitals. Dr. Boye, chief of staff at DCH, had served on DCH's credentials and executive committees; he had also served on DCH's board of trustees. Dr. Marino, chief of surgery at DCH, had served on DCH's credentials and executive committees. Dr. Smith, chief of staff at HHMC, had served on HHMC's credentials and executive committees. Dr. Roberson, chief of surgery at HHMC, had served on HHMC's executive committee. Finally, Dr. Stose, chief of surgery at OBMH, had served on OBMH's credentials and executive committees.

This appeal concerns only Dr. Bolt's federal antitrust claims; we relegate our discussion of his other claims to the margin.[6]

---

remainder of the term of his existing appointment.

2. At the time of the decision, Dr. Bolt's existing appointment at OBMH was apparently not yet due to expire. In addition to denying reappointment, the executive committee summarily suspended Dr. Bolt's privileges for the remainder of the term of his existing appointment.

3. The record does not reveal the precise date.

4. Also named as a defendant was Humana, Inc., DCH's parent corporation. When we refer in this opinion to DCH in its capacity as a defendant, we mean both DCH and Humana, Inc.

5. Also named as defendants were Dr. C.R. DeArmas, Jr. and Dr. Thurman Gillespy, Jr. The district court dismissed Drs. DeArmas and Gillespy before trial, and Dr. Bolt does not challenge that ruling in this appeal.

6. The federal antitrust claims were contained in count I of the complaint. Count II contained

claims under 42 U.S.C. § 1983 (1982). Citing several defects in the procedures the defendants used in reaching their decisions to revoke his staff privileges, Dr. Bolt alleged in count II that the defendants had deprived him of his fourteenth amendment rights to due process and equal protection of the laws.

Count III was styled "federal contractual claims." In that count, Dr. Bolt alleged that the three hospitals, as participants in the federal Medicare program, had a contractual obligation to the United States government to comply with certain federal regulations pertaining to peer review procedures. Dr. Bolt alleged that the three hospitals had failed to comply with these regulations and had therefore breached their contractual obligation to the United States government, and that he, as a third party beneficiary, had suffered an actionable harm.

Counts IV through X contained a variety of state law claims. In count IV, Dr. Bolt alleged that when he was first granted probationary privileges by the three hospitals, each hospital

As to the antitrust claims, Dr. Bolt alleged that the defendants had conspired, along with unnamed coconspirators, to restrain competition in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1982).[7] Specifically, Dr. Bolt alleged the existence of three separate conspiracies: one involving DCH and the members of its medical staff who took part in the DCH peer review decision to revoke his privileges, one involving HHMC and the members of its medical staff who took part in the peer review decision there, and one involving DCH, HHMC, OBMH,[8] the members of their staffs who took part in their peer review decisions, and VCMS.

Before trial, the district court convened a hearing to resolve several pending motions. One of these was a motion by the defendants concerning the order of proof at trial. Noting that a claim under section 1 of the Sherman Act requires proof of (1) a contract, combination, or conspiracy, and (2) restraint on competition,[9] the defendants requested the district court to require Dr. Bolt to present his evidence regarding the "contract, combination, or conspiracy" element first. The defendants urged that this course would be an efficient one; if Dr. Bolt's evidence of concerted action proved insufficient to go to the jury, the district court could enter directed verdicts for the defendants at the close of that evidence, thus saving Dr. Bolt from presenting unnecessarily his evidence of restraint on competition. The district court agreed that this would be an efficient way to proceed, and accordingly ruled that Dr. Bolt would be required to present his evidence of concerted action first.

The defendants also moved the district court to rule prior to trial that any evidence attacking the merits of the staff privileges decisions at the three hospitals would be inadmissible. Dr. Bolt proposed to show, through the testimony of Dr. Edward R.

implicitly promised that his privileges would be terminated according to the procedures set out in the hospital's bylaws. Each hospital, Dr. Bolt alleged, had breached that promise, and Dr. Bolt requested the court to enter an injunction requiring the hospitals to reinstate his privileges. Count V contained claims for interference with prospective economic advantage. Count VI contained claims under Florida antitrust laws. Count VII contained claims for intentional infliction of emotional distress. Count VIII contained a claim for slander, and counts IX and X each contained a separate claim for libel.

After the parties joined issue, the defendants moved the district court, pursuant to Fed.R.Civ. P. 56, to enter summary judgment on all counts. The court denied summary judgment on the federal antitrust claims and the state law claims. It granted summary judgment on the section 1983 claims, but only insofar as those claims pertained to DCH, VCMS, Dr. Boye, Dr. Marino, and Dr. Stose. As to those defendants, the court held that the requisite state action was missing. As to the section 1983 claims against the remaining defendants—HHMC, Dr. Smith, and Dr. Roberson—the court indicated that it would defer ruling on the motion for summary judgment, and would sever the claims so that the parties could proceed to trial on the federal antitrust and state law claims.

The parties thus proceeded to trial. As explained in the text, the district court ordered Dr. Bolt to present his evidence of conspiracy first. After he had done so, the defendants moved the district court for directed verdicts on the federal antitrust claims, and the court granted the mo-

tions. The court thereafter granted the pending motions by HHMC, Dr. Smith, and Dr. Roberson for summary judgment on the section 1983 claims. Having thus disposed of all the federal claims, the court dismissed the state law claims without prejudice.

7. Dr. Bolt also alleged that the defendants had conspired to engage in a monopoly in violation of 15 U.S.C. § 2 (1982). Our discussion of the conspiracy aspect of Dr. Bolt's section 1 claims applies equally to the conspiracy aspect of his section 2 claims.

8. Although the complaint alleges a conspiracy involving HHMC and members of it medical staff, and another conspiracy involving DCH and members of its medical staff, it does not allege yet another separate conspiracy involving OBMH and members of its medical staff. This may be because the OBMH governing board had not taken final action against Dr. Bolt at the time he instituted this lawsuit. In any event, the OBMH defendants, OBMH and Dr. Stose, are identified in the complaint only as taking part in the larger conspiracy involving all three hospitals, members of their medical staffs, and VCMS.

9. Section 1 provides as follows:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal....

15 U.S.C. § 1 (1982).

Woodward, chairman of the department of surgery at the University of Florida Medical School, that at least some of the hospitals' stated grounds for their actions against him were pretextual. Specifically, Dr. Bolt wished to attack as pretextual those grounds that pertained to specific medical cases in which he had been involved; he informed the court that Dr. Woodward had reviewed the medical files for those cases and was prepared to testify that no legitimate basis existed for the charges leveled against Dr. Bolt. The district court rejected the proffer, ruling that the Woodward testimony would not be admitted.

The case proceeded to trial before a jury. Dr. Bolt put on his evidence of conspiracy first, as required by the district court's pretrial ruling. At the close of this evidence, the defendants moved the court to enter directed verdicts pursuant to Fed.R. Civ.P. 50(a). The court granted the motions, ruling that Dr. Bolt had failed to adduce evidence of a "contract, combination, or conspiracy," within the meaning of section 1 of the Sherman Act, sufficient to take the case to the jury. Dr. Bolt now appeals, attacking the district court's evaluation of the sufficiency of the admitted evidence as well as its exclusion of the proffered Woodward testimony.

## II.

In this appeal, we are concerned only with the "contract, combination, or conspiracy" element of Dr. Bolt's section 1 claims; as explained above, the district court based the directed verdicts solely on the perceived deficiency of Dr. Bolt's evidence in that regard. Due to the ordering of proof mandated by the district court, Dr. Bolt had no opportunity to present evidence pertaining to how the defendants' actions restrained competition. Our focus on appeal is therefore a narrow one: With respect to the "contract, combination, or conspiracy" element of Dr. Bolt's section 1 claims, was the

evidence—that which was admitted and that which should have been admitted—sufficient to take the case to the jury? In order for us to answer that question affirmatively, "[t]here must be evidence that tends to exclude the possibility that [the defendants] were acting independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984).

As we have already noted, Dr. Bolt alleged the existence of three separate conspiracies: (1) a conspiracy involving DCH and members of its medical staff, (2) a conspiracy involving HHMC and members of its medical staff, and (3) a conspiracy involving DCH, HHMC, OBMH, members of their medical staffs, and VCMS. For the sake of convenience, we will refer to these alleged conspiracies as the DCH conspiracy, the HHMC conspiracy, and the community-wide conspiracy. In its memorandum order, the district court discussed only the community-wide conspiracy. Since the court entered directed verdicts in favor of all defendants on all of Dr. Bolt's antitrust claims, however, we must assume that the court found the evidence wanting with respect to each of the conspiracies alleged in the complaint. Our task in this appeal, then, is to determine if the evidence regarding any of the three alleged conspiracies was sufficient to allow the case to go to the jury.

After oral argument, we requested the parties to brief an issue they had not addressed in their original briefs: whether the defendants were exempt from federal antitrust liability under the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The parties responded to our request, and we are now prepared to address that issue.[10] Thus, we organize our analysis as follows. We treat each of the alleged conspiracies separately, and ask first whether the defendants identified as coconspirators in the

10. HHMC raised the state action defense in the district court, but the court deferred ruling on HHMC's motion for summary judgment on that point. We address the issue here in keeping with the principle that we may affirm a district court's ruling on a ground upon which the district court did not rely. The applicability of the state action exemption is a purely legal question. We take judicial notice of the applicable Florida statutes and case law.

particular conspiracy are exempt from antitrust liability under the state action doctrine. If the defendants are not exempt, we proceed to evaluate the evidence pertinent to the conspiracy to determine whether it was sufficient to withstand the motions for directed verdict. We begin with the DCH conspiracy.

## A.

The alleged coconspirators in the DCH conspiracy were DCH and the members of its medical staff who took part in the DCH peer review decision to revoke Dr. Bolt's privileges.[11] Preliminarily, we note that the directed verdicts would certainly have been proper if, as a matter of law, the DCH defendants were legally incapable of concerted action within the meaning of section 1 of the Sherman Act. We perceive no basis, however, for holding that the members of a medical staff are legally incapable of conspiring with one another. Each such member practices medicine in his individual capacity; each is a separate economic entity potentially in competition with other physicians. *See Weiss v. York Hosp.*, 745 F.2d 786, 814 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *Cooper v. Forsyth County Hosp. Auth. Inc.*, 789 F.2d 278, 282 (4th Cir.) (Motz, J., concurring), *cert. denied*, 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986). Additionally, we perceive no basis for holding that a hospital is legally incapable of conspiring with the members of its medical staff. Relying on the rule that a corporation cannot conspire with its officers and directors, *see, e.g., Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 455 & n. 7 (9th Cir.1979), some courts have held that a hospital likewise cannot conspire with its medical staff for purposes of section 1 liability. *See, e.g., Weiss*, 745 F.2d at 815–17; *Buckner v. Lower Florida Keys Hosp. Dist.*, 403 So.2d 1025, 1029 (Fla.Dist.Ct.App.1981). We find this analogy faulty, and we decline to embrace it. The traditional rule regarding corporations is based on considerations

unique to the corporate context. Theoretically, a "conspiracy" involving a corporation and one of its agents would occur every time the agent performs some act in the course of his agency, for such an act is deemed by the law to be an act of the corporation. Thus, the rule that a corporation is incapable of conspiring with its agents is necessary to prevent erosion of the principle that section 1 does not reach unilateral acts. A hospital and the members of its medical staff, in contrast to a corporation and its agents, are legally separate entities, and consequently there is no similar danger that what is in fact unilateral activity will be bootstrapped into a "conspiracy." In sum, then, we hold that a hospital and the members of its medical staff are all legally capable of conspiring with one another.

We therefore turn to the question whether the DCH defendants are exempt from antitrust liability under the state action doctrine. DCH is a private hospital. The state action exemption, in its inception, applied only in suits against state officers. *See Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The Supreme Court, however, has come to recognize that the exemption may apply in suits against private parties under some circumstances.

In *Parker*, a raisin producer filed an action against a California state official to enjoin enforcement of the state's Agricultural Prorate Act, which created a program "to restrict competition among the growers [of raisins] and maintain prices in the distribution of their commodities to packers." *Id.* at 346, 63 S.Ct. at 311. Recognizing that the state's program was anticompetitive, the Supreme Court nevertheless found no violation of federal antitrust law, concluding that "nothing in the language of the Sherman Act or in its history ... suggests that its purpose was to restrain a state or its officers from activities directed by its legislature." *Id.* at 350–51, 63 S.Ct. at 313. Thus, the Court

---

**11.** Of the DCH staff members who participated in the peer review decision, two are named as defendants in this case: Dr. Boye and Dr. Mari-

no. In this opinion, we sometimes refer to these defendants and DCH collectively as "the DCH defendants."

interpreted the Sherman Act as not prohibiting states from imposing restraints on competition. This interpretation of the Sherman Act is what has become known as the state action doctrine.

Although *Parker* involved a suit against a state official, the Supreme Court subsequently recognized that the state action exemption may also apply in a suit against a private party. *See, e.g., Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 58–59, 105 S.Ct. 1721, 1727, 85 L.Ed.2d 36 (1985). Since state economic regulation obviously entails regulation of private conduct, the Court has reasoned that the state action exemption would lose much of its force if the federal government or a private litigant could always enforce the Sherman Act against the regulated private parties. At the same time, the Court has recognized that extending the state action doctrine to private parties creates the danger that private parties, by merely invoking "a gauzy cloak of state involvement," *California Retail Liquor Dealers Ass'n v. Midcal Aluminum,* 445 U.S. 97, 106, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980), will attempt to use the doctrine to immunize what are essentially private restraints on competition. To ensure that the state action doctrine is used to immunize only those activities that are truly the product of state regulation, the Court has developed a rigorous two-prong test to be applied when a private party claims entitlement to the exemption. First, "the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy.'" *California Retail Liquor Dealers Ass'n,* 445 U.S. at 105, 100 S.Ct. at 943 (quoting *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978)). Second, the conduct in question "must be 'actively supervised' by the State itself." *Id.* It is this two-prong test that the DCH defendants must satisfy if their involvement in the DCH conspiracy is to be deemed immune from antitrust liability.

We have little difficulty concluding that Florida law expressed [12] a clearly articulated policy sanctioning the kind of peer review DCH used in reaching its decision to revoke Dr. Bolt's privileges. Fla.Stat. § 395.065(1) (1981) provided that "[t]he medical staff of any [licensed hospital] is authorized to suspend, deny, revoke, or curtail the staff privileges of any staff member for good cause." Fla.Stat. § 395.0653(3) (1981) required every licensed hospital to "set standards and procedures to be applied by the hospital *and its medical staff* in considering and acting upon applications for staff membership or professional privileges." (Emphasis added.) Fla.Admin.Code Ann. r. 10D–28.56(f) (1981) expressly stated that "[n]o action shall be taken [by the hospital's governing board] without prior referral to the medical staff for their recommendation."

The question whether Florida actively supervised peer review determinations is a somewhat more difficult one. In *Patrick v. Burget,* —— U.S. ——, 108 S.Ct. 1658, 1664, 100 L.Ed.2d 83 (1988), the Supreme Court held that "[t]he State does not actively supervise [the termination of hospital staff privileges] unless a state official has and exercises ultimate authority over private privilege determinations." A state official has this kind of authority only if he or she has "power to review private peer-review decisions and overturn a decision that fails to accord with state policy." *Id.* In support of their assertion that Florida actively supervised peer review determinations, the DCH defendants cite Fla.Stat. § 458.337(1)(b) (1981), which required notification of the Florida Board of Medical Examiners, a state agency, whenever a physician "[h]as been disciplined ... by a licensed hospital or medical staff of said hospital." Nothing in this provision, however, indicates that the Board has power to overturn a peer review decision. The apparent purpose of the notification requirement is to enable the Board to take further

---

12. The state law relevant to our inquiry is that which was in effect when the defendants engaged in the challenged conduct. *See Tambone*

*v. Memorial Hosp. for McHenry County, Inc.,* 825 F.2d 1132, 1134–35 (7th Cir.1987).

disciplinary action if it deems such further action appropriate. We have no reason to believe that the Board has ever purported to overturn a private peer review decision.[13] Thus, we must look elsewhere for active state supervision.

A possible supervisory authority is the state judiciary. To date, the Supreme Court has found active state supervision only in cases involving supervision by a state agency, *see, e.g., Southern Motor Carriers,* or by a state supreme court charged with regulating the professional conduct of the members of its bar. *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). The Court has left open the question whether judicial review in the context of a traditional lawsuit may constitute active state supervision. *Patrick,* — U.S. at —, 108 S.Ct. at 1664–65.

We perceive no principled basis for distinguishing traditional judicial review from agency review, however. The purpose of the active state supervision requirement is to ensure that the conduct in question is in fact the product of state regulation. A state may choose to regulate private economic activity through a state agency; it may just as readily choose to regulate such activity through its courts. Indeed, regulation through the judiciary may be more likely to ensure accurate implementation of the state's policy, for courts are especially well suited to divine, interpret, and enforce legislative policy.

To be sure, agency review and judicial review do differ in some respects. For instance, agency review is a creature of express statutory authorization, whereas judicial review may or may not be. Additionally, agency review, unlike traditional judicial review, may be automatic in the sense that the agency may be statutorily obligated to review every decision within its jurisdiction, regardless of whether an aggrieved party has actually lodged a complaint.

■ Noting these differences, however, does not detract from our conclusion that judicial review may constitute active state supervision for purposes of the state action exemption. That judicial review may be provided without express legislative authorization does not make that review any less a form of regulation by the state. It is sufficient if the legislature clearly articulates a policy and then acquiesces in the courts' implementation of that policy. Legislatures undoubtedly presume that courts will enforce the policy they articulate without express direction to do so. Further, that judicial review is not automatic in the sense that it must be triggered by the affirmative act of an aggrieved party does not make the state's supervision any less effective. A legislature may conclude that the most efficient way for the state to achieve its regulatory goals is to review only those cases in which a complaint has been lodged; it may quite legitimately presume that parties who believe they have been injured by conduct inconsistent with state policy will act on their self interest and seek redress for the wrong that has been worked against them. In terms of the state achieving its regulatory goals, then, the global result will likely closely approximate the result that would be reached if the state reviewed each decision as a matter of course.

Of course, judicial review cannot constitute active state supervision unless it is available on an established basis and is of a sufficiently probing nature. To be sufficiently probing, the scope of judicial review must first of all encompass the fairness of the procedures used in reaching the decision. Furthermore, it must involve consideration of whether the criteria used by the decisionmakers were consistent with state policy and whether the decision had a sufficient basis in fact. Our review of the Florida case law convinces us that such review is available in the Florida courts.

---

**13.** It is irrelevant that the state of Florida may have exercised some form of supervision over the kind of procedures DCH used in conducting its peer review; the relevant question is whether the state has authority to overturn the privileges determination itself. *Patrick,* — U.S. at —, 108 S.Ct. at 1663.

Florida courts have recognized that a physician whose staff privileges at a hospital have been revoked has a cause of action for injunctive relief. In articulating the basis for this cause of action, the courts have relied on a contract theory. Florida courts have reasoned that when a physician forms a professional relationship with a hospital, the hospital promises that the relationship will not be terminated unless certain conditions are satisfied, those conditions being expressed, either explicitly or implicitly, in the hospital's bylaws. *See, e.g., Margolin v. Morton F. Plant Hosp. Ass'n*, 348 So.2d 57, 57 (Fla.Dist.Ct.App. 1977); *see also Lawler v. Eugene Wuesthoff Memorial Hosp. Ass'n*, 497 So.2d 1261, 1263–64 (Fla.Dist.Ct.App.1986); *Palm Beach-Martin County Medical Center, Inc. v. Panaro*, 431 So.2d 1023, 1024– 25 (Fla.Dist.Ct.App.1983). At the time pertinent to our inquiry, DCH's bylaws established, as required by Florida law,[14] procedures for the termination of staff privileges. Such bylaws, the case law indicates, are deemed to constitute a promise that termination of staff privileges will be based on fair procedures, valid criteria, and sufficient evidence—a promise that is enforceable by way of the cause of action for injunctive relief against the hospital.[15] Courts have, for instance, frequently re- viewed staff privileges decisions to ascertain whether they were reached by way of fair procedures. *See, e.g., Dance v. North Broward Hosp. Dist.*, 420 So.2d 315 (Fla. Dist.Ct.App.1982). They have also re- viewed the criteria used in reaching the decisions to determine whether those criteria are consistent with state policy. *See, e.g., Sarasota County Public Hosp. Bd. v. Shahawy*, 408 So.2d 644 (Fla.Dist.Ct.App. 1981); *cf. Hackett v. Metropolitan Gen. Hosp.*, 422 So.2d 986 (Fla.Dist.Ct.App.1982) (physician's complaint, which alleged that hospital had taken action in violation of statute pertaining to medical staff privileges, stated cause of action). Finally, courts have reviewed the sufficiency of the evidence relied upon by the decisionmakers. *See, e.g., North Broward Hosp. Dist. v. Mizell*, 148 So.2d 1, 5 (Fla.1962) (remanding for finding as "proof of facts reasonably requiring suspension"); *Horgan v. South Broward Hosp. Dist.*, 477 So.2d 617, 617 (Fla.Dist.Ct.App.1985) ("We have reviewed the record and find that it contains competent, substantial evidence to support the administrative action taken."); *Dance*, 420 So.2d at 316 ("[T]here was adequate evidence upon which to base the permanent suspension."); *Shahawy*, 408 So.2d at 647 (remanding for finding as to whether the privileges termination decision "was sup-

14. Fla.Stat. § 395.0653(3) (1981) provided that "the governing body of every hospital shall set standards and procedures to be applied by the hospital and its medical staff in considering and acting upon applications for staff membership or professional privileges." The Florida Administrative Code provided that "[t]he governing authority in fulfilling its responsibility shall be organized under approved written bylaws, rules and regulations which shall ... [p]rovide for the appointment, reappointment, or dismissal of members of the medical staff, and a procedure for hearing and appeal." Fla.Admin.Code Ann. r. 10D–28.56(1)(f) (1981).

15. Florida courts have recognized this cause of action for injunctive relief even though Fla.Stat. § 395.065(2) (1981) provides that "[t]here shall be no liability on the part of, and no cause of action of any nature shall arise against, any hospital ... for any action taken in good faith and without malice [in conducting peer review pursuant to Florida law]." One Florida court has explained this apparent inconsistency in the following way:

Section 395.065(2) expressly concerns itself with "liability," which we construe to mean responsibility for damages proximately resulting from a tort. We also construe the subsequent phrase in the same subsection, "cause of action of any nature," as referring to and limited by the word "liability." Were we to construe this subsection as completely eliminating any cause of action of any nature against a hospital which gave such inadequate notice of the reasons reappointment was not being recommended, but without malice, then any determinative hearing could be held by the hospital with complete immunity, notwithstanding the physician's substantial inability to prepare therefor. Similarly, any arbitrary and capricious, but not malicious action taken upon an application for reappointment would go totally unanswered. Article I, section 21, Florida Constitution, will not tolerate that happening, as it provides: "The courts shall be open to every person for redress of any injury...."

*Carida v. Holy Cross Hosp., Inc.*, 427 So.2d 803, 806 n. 6 (Fla.Dist.Ct.App.1983).

ported by competent substantial evidence").[16]

In sum, we find that Florida courts provide judicial review of staff privileges decisions that is sufficiently probing to constitute active state supervision: the courts will review the fairness of the procedures, the validity of the criteria used, and the sufficiency of the evidence.[17] Because the DCH defendants have therefore established both prongs of the state action exemption test, we affirm the directed verdicts for these defendants with respect to their involvement in the DCH conspiracy.

## B.

█ The HHMC conspiracy is of the same nature as the DCH conspiracy. The alleged coconspirators are HHMC and the members of its staff who participated in the HHMC peer review decision to revoke Dr. Bolt's privileges.[18] The state action exemption applies here for the same reasons that it applies with respect to the DCH defendants' involvement in the DCH conspiracy.[19] Accordingly, we affirm the directed verdicts for the HHMC defendants with respect to their role in this conspiracy.

## C.

█ Finally, we come to the alleged community-wide conspiracy. The alleged co-

conspirators here are DCH, HHMC, OBMH, the members of their medical staffs who participated in the decisions to revoke Dr. Bolt's staff privileges, and VCMS. Dr. Bolt's allegation is that these defendants conspired to drive him out of the Daytona Beach medical community. Again, we begin with the state action exemption question. VCMS makes no claim to the exemption. We concluded above that the exemption is available to the DCH defendants with respect to their role in the DCH conspiracy, and to the HHMC defendants with respect to their role in the HHMC conspiracy. We reach a different conclusion, however, as to the involvement of these defendants in the community-wide conspiracy. We reach that conclusion based on the defendants' patent inability to establish the first prong of the state action exemption test: clearly, Florida has articulated no policy favoring participation by any of the DCH or HHMC defendants in a multi-hospital scheme to rid a medical community of a particular physician. This reasoning applies equally to the OBMH defendants.

Having concluded that the state action exemption cannot be claimed by any of the defendants with respect to the community-

16. The standards for reviewing staff privileges decisions are the same for public and private hospitals. *Carida v. Holy Cross Hosp., Inc.*, 427 So.2d 803, 805 (Fla.Dist.Ct.App.1983); *see also Lawler v. Eugene Wuesthoff Memorial Hosp. Ass'n*, 497 So.2d 1261, 1264 (Fla.Dist.Ct.App. 1986).

17. We are confident that this form of review was available at the time Dr. Bolt's privileges were revoked. We acknowledge that some of the Florida cases we have cited were decided after the events in this case occurred. Those cases, however, reinforce or elaborate upon the principles stated in the earlier cases; they do not represent departures from prior law. We note that Dr. Bolt was obviously aware when he filed his complaint in the district court that the cause of action for injunctive relief was cognizable under Florida law. The pendent state claim alleged in count IV of his complaint, *see supra* note 6, is based on that cause of action.

18. Of those members of the HHMC staff who participated in the peer review decision, two are named as defendants in this case: Dr. Smith

and Dr. Roberson. In this opinion, we sometimes refer to these defendants and HHMC collectively as "the HHMC defendants."

19. HHMC is not a private hospital like DCH; rather, it is a "special district" created by the Florida legislature. *See* 1979 Fla.Laws 577. As such, HHMC may be more akin to a municipality than a private person for purposes of state action exemption analysis. In *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), the Supreme Court held that it is sufficient for a municipality to establish that it acted pursuant to a clearly articulated state policy; unlike a private person, a municipality need not also establish active state supervision. *Id.* at 46–47, 105 S.Ct. at 1720. Because we conclude that both clear articulation and active state supervision are present in this case, we do not decide whether HHMC should be treated as a municipality rather than a private person. *Cf. Hospital Dev. & Serv. Corp. v. North Broward Hosp. Dist.*, 619 F.Supp. 535 (S.D.Fla.1985) (Florida special district treated as municipality for purposes of state action exemption analysis).

wide conspiracy, we turn to the question whether the district court erred in concluding that the evidence of concerted action was insufficient to send the case to the jury. We divide our discussion of the evidence into two parts. First, we discuss the evidence that relates to the alleged involvement of the three hospitals and members of their medical staffs. We then examine separately the evidence that relates to the alleged involvement of VCMS.

### 1.

#### a.

The admitted evidence relating to the alleged involvement of the three hospitals and members of their medical staffs can be broken down into three categories: (1) evidence of parallel action, (2) evidence of inter-hospital communication, and (3) direct evidence that the decisionmakers at the three hospitals agreed among themselves to take concerted action to drive Dr. Bolt out of the Daytona Beach medical community.

We have already described the evidence of parallel action. To repeat, during the months of September and October of 1981, the executive committee at each of the three hospitals voted to recommend that Dr. Bolt be denied both elevation to active staff membership and reappointment.

The evidence of inter-hospital communication logically falls into three subcategories. First, there was evidence that the individual defendants had ample opportunity to communicate among themselves about Dr. Bolt. Each of the individual defendants held staff privileges at more than one of the three hospitals; most of them held staff privileges at all three. Second, there was evidence of actual inter-hospital conversations about Dr. Bolt. For example, Dr. Smith, chief of staff at HHMC, approached Dr. Boye, chief of staff at DCH, in January 1981 and suggested to Dr. Boye that he encourage Dr. Bolt to seek counsel-

ing through the Impaired Physicians Program.[20] Third, there was evidence that each hospital's executive committee based its decision, at least in part, on alleged misconduct by Dr. Bolt that occurred at one of the other two hospitals. For example, after the HHMC executive committee voted to revoke Dr. Bolt's privileges, it sent him a letter listing eight grounds for its decision; three of those grounds pertained to incidents that occurred at DCH. And Dr. France, chief of staff at OBMH, told Dr. Bolt that the OBMH executive committee had based its decision solely on incidents that occurred at DCH and HHMC.

Dr. Bolt's testimony was the only evidence offered as direct evidence that the decisionmakers at the three hospitals had agreed among themselves to drive Dr. Bolt out of the Daytona Beach medical community. Dr. Bolt testified that Dr. Marino, chief of surgery at DCH, told him that he, Dr. Marino, had told the DCH credentials committee that Dr. Stose, chief of surgery at OBMH, had told him that "They're going to get rid of [Dr. Bolt] at [HHMC]; therefore, we got to talk about getting rid of him at [OBMH]." Dr. Bolt also testified that Dr. Marino told him that he, Dr. Marino, had told the DCH Credentials Committee "Listen, here's the plan. They're going to get rid of him at [HHMC]. That means we're going to get rid of him at [OBMH] and I think because other two hospitals are going to get rid of him, we've got to seriously think of getting rid of him at [DCH]."

We conclude that this body of admitted evidence was not sufficiently probative of conspiracy to withstand the motions for directed verdicts. With regard to the evidence of conscious parallelism, the rule in this circuit is that such evidence does not permit an inference of conspiracy unless the plaintiff establishes that each defendant that engaged in the parallel action acted contrary to its economic self-interest.

---

**20.** Additionally, in December 1981, Dr. Boye appeared in proceedings before the HHMC judicial review committee in connection with its review of the HHMC executive committee's decision to revoke Dr. Bolt's privileges. Dr. Mari-

no, chief of surgery at DCH, also appeared at those proceedings. Dr. Patel, chief of staff at OBMH, testified at the September 10, 1981 meeting of the DCH credentials committee.

*See Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 559 (5th Cir.1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981).[21] What this means is that the plaintiff must establish with respect to each defendant that it would have been unreasonable in a business sense for that defendant to engage in the challenged conduct unless it had assurances from the other defendants that they would take the same action. This record, in its present state, does not contain evidence of this nature.

■ The evidence of inter-hospital communication is also insufficient to permit an inference of conspiracy. It is well settled that the mere opportunity to conspire among antitrust defendants is insufficient to permit the inference of conspiracy. *Cooper v. Forsyth County Hosp. Auth. Inc.*, 789 F.2d 278, 281 (4th Cir.), *cert. denied*, 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986); *see also Feldman v. Jackson Memorial Hosp.*, 571 F.Supp. 1000, 1008 (S.D.Fla.1983), *aff'd*, 752 F.2d 647 (11th Cir.), *cert. denied*, 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985); *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir.1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). That the defendants may have talked among themselves about Dr. Bolt's difficulties at the various hospitals is also insufficient to permit an inference of conspiracy. *Cf. Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763–64, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984); *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925); *Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925). The same is true with regard

to the evidence that the executive committees may have based their decisions on Dr. Bolt's misconduct at the other hospitals. Such evidence does not permit an inference of conspiracy unless there is some indication that the defendants' actions were attributable to reasons other than legitimate, independent business reasons.[22] The evidence admitted at trial contains no such indication.

■ Finally, the out-of-court statements by Dr. Marino fail to evidence the kind of multi-hospital conspiracy that Dr. Bolt alleges. The statements were properly admitted against Dr. Marino as an admission by a party-opponent. *See* Fed.R. Evid. 801(d)(2). The statements merely established, however, that Dr. Marino told the DCH credentials committee (1) that he was aware that the OBMH executive committee was considering revoking Dr. Bolt's privileges based on what had occurred at HHMC, and (2) that since the other two hospitals were considering revoking or had already revoked Dr. Bolt's privileges, DCH should consider doing the same. At most, these statements evidence that the DCH credentials committee had knowledge of Dr. Bolt's difficulties at the other hospitals and that it may have based its own recommendation at least in part on that information.[23]

In sum, none of the evidence admitted at trial permits an inference of a multi-hospital conspiracy. Viewed in a light most favorable to Dr. Bolt, the evidence merely establishes that decisionmakers at each one of the three hospitals based their decisions at least in part on matters that occurred at the other two hospitals. As we have explained, such evidence by itself does not

---

**21.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**22.** A hospital might have a number of legitimate independent business reasons for disciplining a staff physician based on his or her misconduct at another hospital. For example, a hospital may, under some circumstances, incur tort liability for its failure to screen carefully its professional staff. *See, e.g., Elam v. College Park*

*Hosp.*, 132 Cal.App.3d 332, 340–47, 183 Cal.Rptr. 156, 161–65 (1982). That a hospital failed to take action against a staff member when it knew or should have known of that member's misconduct at another hospital might very well be relevant to this species of liability.

**23.** Dr. Bolt places unwarranted emphasis on Dr. Marino's use of the word "plan." Placed in context, the reference is to a proposed course of action at DCH, not to some multi-hospital scheme.

permit an inference of conspiracy. Thus, unless the district court erroneously excluded admissible evidence that is probative of conspiracy, we must affirm the directed verdicts.

b.

Dr. Bolt contends that the district court erred in forbidding him from introducing the testimony of his expert witness, Dr. Woodward. As already noted, Dr. Bolt proposed to use Dr. Woodward's testimony to attack as pretextual some of the grounds upon which the defendants had based their respective decisions. Dr. Bolt's proffer to the district court was as follows. First, he indicated that the evidence showed that all three hospitals had based their individual decisions in part on two incidents, both occurring at DCH, in which Dr. Bolt's medical or professional judgment had been called into question.[24] Dr. Bolt proposed to show that the medical staff at DCH had investigated the incidents and had made certain findings upon which it then based its decision to revoke Dr. Bolt's privileges. He proposed to show that the results of the DCH investigations were subsequently used by the medical staffs at HHMC and OBMH as bases for their own decisions to revoke Dr. Bolt's privileges. Dr. Woodward was prepared to testify that he had reviewed the facts underlying the DCH investigations and had concluded that no reasonable medical practitioner would have reached the conclusions that the DCH investigators reached.[25] By showing that the findings of the DCH investigations were entirely baseless, and by showing that the decisionmakers at all three hospi-

24. It is not clear whether all three executive committees drew up formal lists of charges; if they did, Dr. Bolt did not introduce those documents into evidence. He did introduce a letter he received from the HHMC executive committee in which the committee cited the two DCH incidents as grounds for its own decision. As to the OBMH executive committee, the evidence shows only that it relied on unspecified incidents that occurred at DCH; no evidence was introduced showing that the OBMH executive committee relied specifically on the two DCH incidents in question. Nonetheless, we think that the jury could infer from the evidence before it that the OBMH executive committee did rely on those incidents; the evidence does show that an administrator at OBMH contacted an administrator at DCH and requested information from Dr. Bolt's DCH disciplinary file. Of course, the OBMH defendants will have the opportunity to show, on remand, that they did not rely on DCH incidents, or that the DCH incidents upon which they did rely did not include the two incidents to which Dr. Woodward's testimony pertains.

25. The first of the two cases involved a patient at DCH named Maribelle Winn. Mrs. Winn died at DCH while under the care of Dr. Smith, Dr. Bolt, and Dr. Smith's medical partner, Dr. Ruben. Soon after Mrs. Winn's death, Dr. Bolt telephoned her surviving daughters and told them that their mother would not have died but for the negligent care she received from Drs. Smith and Ruben. This action by Dr. Bolt apparently enraged Dr. Smith; in his deposition, Dr. Smith remarked that he could have "pinned [Dr. Bolt's] ass to the front door with [his] fist."

Some time later, Dr. Schildecker, a pathologist at DCH and a member of the DCH executive committee, conducted an investigation of the Winn death. Dr. Schildecker's conclusion was that Drs. Smith and Ruben had engaged in no wrongdoing. It appeared, therefore, that Dr. Bolt had acted maliciously and unprofessionally when he called the Winn daughters and told them that their mother had died because of negligent treatment by Drs. Smith and Ruben. Dr. Bolt's behavior in connection with the Winn case was apparently used by the executive committee at each hospital (including the executive committee at HHMC, where Dr. Smith was chief of staff) as a ground for revoking Dr. Bolt's privileges. See supra note 24.

Dr. Woodward was prepared to testify, based on his review of the Winn medical file, that the treatment Mrs. Winn received from Drs. Smith and Ruben was in fact so grossly inadequate as to amount to negligent homicide. From this testimony, a factfinder could conclude that the charge leveled against Dr. Bolt in connection with the Winn matter—that he had acted maliciously and unprofessionally when he telephoned the Winn daughters—was without foundation.

The second case involved another DCH patient, one Harold Schmidt. Some time after undergoing abdominal surgery, Mr. Schmidt's surgical incision burst open. Alerted to the problem, Dr. Bolt went directly to Mr. Schmidt's room and proceeded to pass retention sutures through the wound, without first giving Mr. Schmidt any form of anesthesia. The Schmidt incident, like the incident involving the Winn death, was apparently used by all three executive committees as a ground for revoking Dr. Bolt's privileges. See supra note 24. Dr. Woodward was prepared to testify, based on his review of the Schmidt medical file, that Dr. Bolt's actions were entirely proper in light of the patient's condition.

tals had relied on those findings, Dr. Bolt hoped to establish the existence of a conspiracy among the three hospitals and members of their medical staffs.

The defendants objected to the proffered testimony on two grounds. First, they objected on relevancy grounds. They argued that the proffered evidence failed, as a matter of law, to raise an inference of conspiracy. Second, they argued that even if the evidence were relevant, it should be excluded because it would unnecessarily confuse the jurors, who would be forced to consider a cumbersome body of facts pertaining to medical cases lacking a direct relationship to the subject matter of the antitrust litigation. The district court apparently found both these arguments persuasive.[26]

■ We conclude that the district court erred to the extent its exclusion of the Woodward testimony was based on relevancy grounds. As we explained above, the fact that the defendants relied on reports emanating from the other hospitals, standing alone, does not permit an inference of conspiracy. Reliance on such reports may be supported by entirely legitimate, independent business reasons.[27] An altogether different case is presented, however, if conclusions contained in the reports were so baseless that no reasonable medical practitioner, considering the same set of facts, would have reached those conclusions. In such a case, the party who relied on the reports can no longer readily point to any legitimate, independent business reason for doing so, and a factfinder may

infer that the party, along with other parties who similarly relied on the same baseless conclusions, were engaged in a scheme to use the conclusions to achieve a common illicit end. In other words, such evidence would "tend[ ] to exclude the possibility that [the defendants] were acting independently." *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471.

That the hospitals additionally relied on other, unrelated grounds for their decisions does not change our analysis. The inference of concerted action remains. It might well be expected that coconspirators would take steps to obscure the direct outlines of their complicity; one way to do that would be for each to supplement the pretextual grounds upon which all relied with other, unrelated grounds. Indeed, if Dr. Bolt can establish that the common grounds were pretextual, evidence that the other, unrelated grounds were themselves baseless may also be probative of conspiracy.[28]

We recognize that the trial court may have based its exclusion of the Woodward testimony on the alternative ground that the testimony would unnecessarily confuse the jurors. Under Fed.R.Evid. 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of … confusion of issues[ ] or misleading the jury." A trial court's ruling pursuant to Rule 403 will not be disturbed absent an abuse of discretion. *See Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492, 1501 (11th Cir.1985). Assuming that the district court relied on Rule 403 as

**26.** The district court apparently believed moreover that Dr. Bolt was precluded, as a matter of law, from attacking the factual basis of any of the grounds upon which the hospitals relied. In the court's view, this would constitute a form of forbidden "de novo review." We are frankly at a loss as to the legal basis for this particular concern. In its memorandum opinion, the court cited *Sosa v. Board of Managers of Val Verde Memorial Hosp.*, 437 F.2d 173 (5th Cir. 1971), as support for its views concerning "de novo review." *Sosa* involved a physician who sued the board of a state hospital, claiming that the board had violated the due process and equal protection clauses of the fourteenth amendment in denying his application for staff privileges. Reduced to its essentials, the case involved two issues: whether the criteria the

board used to judge the plaintiff's application was arbitrary and capricious, and whether the plaintiff had been afforded procedural due process, i.e., notice and a hearing. In the context of this antitrust case, Dr. Bolt is attacking neither the hospitals' procedures nor the substance of the criteria they purported to apply. *Sosa* is plainly inapposite.

**27.** *See supra* note 22.

**28.** We note that the OBMH governing board has apparently yet to take final action against Dr. Bolt. On remand, evidence that no such action has been taken at OBMH would be probative of whether the OBMH defendants participated in the community-wide conspiracy.

a basis for its ruling, we find such an abuse here.

First, as the preceding discussion shows, the trial judge misunderstood the legal import of the proffered evidence; in his mind, the evidence had no probative value as a matter of law. Laboring under this misapprehension, the judge obviously could not have made a sound judgment whether the probative value of the evidence was substantially outweighed by the danger of jury confusion.

Even if the judge had appreciated the legal import of the evidence, we would still conclude that exclusion under Rule 403 was improper. The advisory committee notes to Rule 403 suggest that the "availability of other means of proof" should be considered in determining whether evidence should be excluded under the rule. It is highly unlikely that Dr. Bolt can prove pretext, and thus conspiracy, other than by way of the route he proposes; antitrust conspiracies are nearly always proved through circumstantial evidence. Other courts have found an abuse of discretion where the probative value of the excluded evidence is high and no other evidence is reasonably available to prove an essential element of a claim or defense. *See, e.g., Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1140–41 (3d Cir.1983). We similarly find an abuse of discretion here. We are confident that any danger of jury confusion can be avoided by proper limiting instructions. *See* Fed.R.Evid. 105.

### 2.

The evidence relating to the alleged involvement of the Volusia County Medical Society in the community-wide conspiracy was as follows. VCMS was a local professional organization which published a periodical known as *The Stethoscope*. The December 1981 edition of this periodical contained an article, authored by the society's president, entitled "The Problem Physician." The article mentioned no particular physician by name, but discussed generally the problems associated with physicians whose abrasive personalities disrupt the de-

livery of medical care in the hospital context.

In his brief, Dr. Bolt describes the *Stethoscope* article as a clarion call to all physicians to band together to drive him out of the Daytona Beach medical community. Thus, the Volusia County Medical Society, through its publication, allegedly became an active ringleader in the community-wide conspiracy.

■■■ We agree with the district court that this evidence is insufficient to permit the inference that the Volusia County Medical Society engaged in concerted action with the other defendants. First, Dr. Bolt's evidence failed to show that the article was directed at him in particular; his conclusion that the author wrote the article with him in mind is pure speculation. More importantly, the supposed "clarion call" was published in December of 1981—*after* the executive committees at the three hospitals had already taken action against Dr. Bolt. The evidence of that the Volusia County Medical Society played any part in the community-wide conspiracy was plainly insufficient to withstand the motion for directed verdict.

### III.

To summarize, we affirm the directed verdicts in favor of the DCH defendants with respect to their involvement in the DCH conspiracy, and in favor of the HHMC defendants with respect to their involvement in the HHMC conspiracy. We hold, however, that the district court erred in directing verdicts in favor of the DCH defendants, the HHMC defendants, and the OBMH defendants with respect to their involvement in the community-wide conspiracy. We affirm the directed verdict in favor of VCMS.

We do not hesitate to say that the district court's handling of this case was unfortunate. The better course would have been to defer ruling on the motions for directed verdicts until after Dr. Bolt had presented his entire section 1 case. In their briefs, the defendants vigorously argue that Dr. Bolt must prove, as part of his section 1 case, that their actions actually

restrained competition; they contend that the directed verdicts were proper because the evidence adduced at trial is wholly deficient in this regard. Whatever the theoretical merits of their legal arguments, the fact remains that the district court entered the directed verdicts before Dr. Bolt reached that part of his case involving restraint on competition. We reiterate that our focus in this appeal has been a narrow one: whether Dr. Bolt's evidence with respect to the "contract, combination, or conspiracy" element of his section 1 claims was sufficient to withstand the motion for directed verdicts. Other potential legal issues in this case are better left for resolution on the basis of a more fully developed record.

AFFIRMED in part, REVERSED in part, and REMANDED.