**Deborah SWEENEY, Plaintiff,**

v.

**ATHENS REGIONAL MEDICAL CENTER, et al., Defendants.**

**Civ. No. 87–06–ATH(DF).**

United States District Court, M.D. Georgia, Athens Division.

March 21, 1989.

Mary M. Brockington, A. Jack Hinton, John C. Butters, Atlanta, Ga., William H. Moore, Jr., Savannah, Ga., James F. Ponsoldt, Athens, Ga., for plaintiff.

Warner S. Currie, Lynn M. Roberson, Swift, Currie, McGee & Hiers, Atlanta, Ga., Emmet J. Bondurant, Bondurant, Mixson & Elmore, Earl W. Gunn, Sidney F. Wheeler, Long, Weinberg, Ansley & Wheeler, Terrance C. Sullivan, Hart & Sullivan, P.C., Atlanta, Ga., Gary M. Blasingame, J. Edward Allen, Jr., Athens, Ga., for defendants.

FITZPATRICK, District Judge.

Plaintiff Deborah Sweeney, a certified nurse-midwife, brought the above-referenced action against the Athens Regional Medical Center (ARMC), the Athens Women's Clinic (AWC), Athens Obstetrics and Gynecology, P.C. (AO & G), and certain doctors connected with AWC and AO & G. In her original Complaint, Plaintiff Sweeney alleged violations of the Sherman Act, 42 U.S.C.A. § 1983, and various provisions of State law. All Defendants have moved for summary judgment as to each claim asserted by Plaintiff Sweeney. In an Order dated February 3, 1989, 705 F.Supp.

1556, this court granted summary judgment in favor of ARMC on all claims asserted against it. The instant Order will address the two motions for summary judgment that remain pending in this case.

## I. INTRODUCTION

In her seven-count Complaint, Plaintiff Sweeney asserted four claims against AWC and its doctors and against AO & G and its doctors. In addition to these four claims, Ms. Sweeney asserted two claims solely against AWC and its doctors. The four claims asserted against both groups of doctors are as follows: (1) a Sherman Act claim; (2) a claim under O.C.G.A. § 16–10–22 alleging an unlawful combination or conspiracy in restraint of free and open competition in transactions with state or political subdivisions; (3) a claim under Georgia law alleging tortious interference with Ms. Sweeney's contractual and business relationships with ARMC and St. Mary's Hospital; and (4) a claim under Georgia law alleging intentional infliction of emotional distress. The two additional claims asserted against AWC and its doctors include (1) a slander claim; and (2) a claim under O.C.G.A. § 10–1–370 *et seq.*, and O.C.G.A. § 10–1–390 *et seq.*, alleging unfair and deceptive business practices. The two claims asserted only against AWC and its doctors were brought as the result of certain statements made by Defendant Mercer to Ms. Sweeney on January 16, 1986. After setting forth a brief statement of facts, the court will address first the four claims common to both groups of doctors and conclude by addressing the two additional claims asserted against AWC and its doctors.

## II. BACKGROUND

In its Order of February 3, 1989, the court set forth a detailed statement of the alleged facts in this matter. *Sweeney v. Athens Regional Medical Center,* 705 F.Supp. 1556 (M.D.Ga.1989). Those facts need not be restated here, but it will be necessary to set forth additional facts relevant to the claims asserted against AWC, AO & G, and the Defendant physicians.

Ms. Sweeney is licensed by the State of Georgia as a registered nurse and is certified as a nurse-midwife by the American College of Nurse Midwives. Deposition of Deborah Sweeney, pp. 110–11, 114–16, 134 (hereinafter Sweeney Dep.). During her time in Athens, Ms. Sweeney has worked as a labor and delivery nurse at ARMC and at St. Mary's Hospital, and as an instructor for the Medical College of Georgia (MCG) in a satellite program for nursing students offered at ARMC. Affidavit of Deborah Sweeney, ¶ 2 and Exhibit B attached to her Affidavit (this affidavit is attached as Exhibit 1 to Ms. Sweeney's Brief in Opposition to ARMC's Motion for Summary Judgment).

At all times relevant to this suit, both AWC and AO & G were professional partnerships with their principal places of business in Athens, Georgia. All the Defendant doctors were connected either with AWC or with AO & G. These doctors, who specialize in delivering babies, practice primarily in the Athens, Georgia area. The AWC doctors handle many of the deliveries at ARMC, and the AO & G doctors do the same at St. Mary's. Deposition of John F. Elder, M.D., p. 9 (hereinafter Elder Dep.).

In the spring of 1985, Ms. Sweeney started a private business called "Family Birth." Sweeney Dep., pp. 13, 23. "Family Birth" offered a childbirth alternative to women in the Athens area in which nurse-midwives, not doctors, provided prenatal care to expectant mothers as well as complete assistance during the delivery. *Id.* In the summer of 1985, Ms. Sweeney placed an advertisement for "Family Birth" in a local newspaper. Because Ms. Sweeney's responsibilities with "Family Birth" increased during the latter part of 1985, beginning in January of 1986, she reduced her teaching load at MCG to half-time. *Id.* at pp. 89–91.

In the fall of 1985, shortly after Ms. Sweeney had advertised "Family Birth," those doctors comprising the Department of Obstetrics at ARMC and the Department of Obstetrics at St. Mary's met jointly to discuss Ms. Sweeney's business. Deposition of William J. Hardman, M.D., pp.

22-26. As a result of this meeting, the Chief of Obstetrics at ARMC and the Chief of Obstetrics at St. Mary's wrote a joint letter which they mailed to the chief administrators at each of the two Athens Hospitals. The letter, which was written on the stationery of the Defendant doctors practicing at AWC, began as follows:

> We have in our community a medical practice that we, as obstetricians, feel must be eliminated. Amy Hathaway, CNM, and Debbie Sweeny [sic], CNM, are doing home deliveries without qualified physician supervision....

Letter from Dr. Robert E. Kelley, Jr. and Dr. William J. Hardman, Jr., dated Nov. 19, 1985 (a copy of the letter is attached as Plaintiff's Exhibit 1 to Dr. Mercer's deposition). In subsequent departmental meetings, the doctors of AWC discussed whether Ms. Sweeney and her students should be allowed access to those hospital patients who were under their care at ARMC. Deposition of Cynthia A. Mercer, M.D., pp. 120-26 (hereinafter Mercer Dep.).

Subsequently, on January 16, 1986, at the nurses' station of the labor and delivery unit at ARMC, Defendant Mercer allegedly accused Ms. Sweeney of (1) practicing illegal medicine; (2) practicing without a back-up physician; (3) exposing patients to unnecessary risks; (4) failing to inform patients of risks; (5) being poorly trained as a midwife; and (6) being irresponsible for the welfare of her patients. Complaint, ¶ 21. According to Ms. Sweeney, Defendant Mercer made her accusations in the presence of several people including nurses, students, and patients. *Id.*

Shortly after the confrontation between Dr. Mercer and Ms. Sweeney, the doctors of AWC agreed to prohibit Ms. Sweeney and her students from having access to patients under their care at ARMC. Mercer Dep., pp. 36-37. These doctors communicated their agreement to ARMC orally, and confirmed the agreement in writing. The letter, dated February 5, 1986, stated:

> ... we simply cannot allow [our patients] to be exposed to students who are being instructed by one who advocates the home delivery concept.

Letter from Drs. R. Smith, L. Smith, Lyons and Mercer to Mr. Martin Sparks, Director of Nursing at ARMC, dated Feb. 5, 1986 (a copy of the letter is attached as Plaintiff's Exhibit 4 to Dr. Mercer's deposition). When presented with the request of the AWC doctors that their patients not be seen by Ms. Sweeney or her students, ARMC officials agreed to enforce the request.

Ms. Sweeney contends that the AWC doctors wanted to eliminate her "Family Birth" business since it directly competed with their own childbirth practice. According to Ms. Sweeney, certain doctors from AWC attempted to persuade other physicians to stop performing "back-up" for Ms. Sweeney's home deliveries.[1] Allegedly, the AWC doctors also attempted to persuade other physicians to prohibit Ms. Sweeney or her students from seeing their patients.

One of these other physicians was Dr. Kaushik Shah. Dr. Shah testified that the Department of OB-GYN at ARMC had adopted an official policy that none of its doctors would provide back-up for planned home births. Specifically, he stated:

> ... Now when I say by no means I can afford to jeopardize my position, because there was an official ... standard of the Department of OB-GYN that we do not do back-up.

Deposition of Kaushik Shah, M.D., p. 122 (hereinafter Shah Dep.). Dr. Shah confirmed this fact by testifying as follows:

> Q: ... I believe you indicated that there was an official position taken by the Department of OB-GYN regarding providing back-up to home deliveries, is that correct?
>
> A: Official position not to support home delivery?
>
> Q: That was a position taken by the Department of OB-GYN?

---

1. Under state regulations, a certified nurse-midwife must practice within a health care system providing for medical consultation, collaborative management, and referral. This system is generally referred to as "back-up." *See* Rules and Regulations of Georgia Board of Nursing, 410-12-.03.

A: Yes, in the departmental meeting. *Id.* at p. 123. Dr. Shah further testified that both Dr. Kelley and Dr. Elder had asked him whether he was providing back-up for Ms. Sweeney. *Id.* at pp. 101–03. During his deposition, Dr. Shah also testified that Dr. Mercer asked him to prohibit Ms. Sweeney and her patients from having access to his patients. His testimony, in pertinent part, was as follows:

> I don't recall, again, the exact chronology, but I mentioned ... a discussion with Dr. Mercer in the midwife meeting, and I don't know when exactly that meeting happened, that she said that she was surprised that my name is linked to that and she asked me would I allow my patients to be taken care by the students of Debby Sweeney. And I said sure, I have no objection.... She said, look, we should not do this and that's the only way we can keep [Ms. Sweeney] out.

*Id.* at 105–06. Dr. Shah further stated:

> Dr. Mercer asked me that she is really surprised, me allowing students of Debby Sweeney to be taken care by—the students of Debby Sweeney to take care of my patients. She said they are not going to allow the students to touch any one of their patients.

*Id.* at p. 50. Although Dr. Shah had originally provided back-up for Ms. Sweeney in the spring and summer of 1985, he stopped doing so in the early fall of 1985. Sweeney Dep., pp. 27–31, 38.

The record indicates that the AWC doctors attend a large majority of all births at ARMC. Ms. Sweeney contends that the decision of the AWC doctors to prohibit her and her students from seeing their patients foreclosed her access to enough patients for meaningful clinical instruction. Affidavit of Deborah Sweeney, ¶ 8 (this Affidavit is attached as Plaintiff's Exhibit 1 to her Brief in Opposition to ARMC's Motion for Summary Judgment). She claims that the decision of the AWC doctors directly injured her independent birth business by damaging her professional reputation and by denying her access to students, colleagues, and acquaintances who were potential clients and sources of client referrals. *Id.*

Following ARMC's decision to enforce the request of the AWC doctors, certain officials at MCG decided to transfer Ms. Sweeney to St. Mary's. Sweeney Dep., pp. 323–24, 337–40. This transfer was met with adverse pressure from the Defendant doctors practicing at AO & G, Defendants Hardman, Herrin, Hill, Crosby, and Elder. These doctors, who attend a large majority of the births at St. Mary's, had been in contact with the AWC doctors at joint monthly meetings and were aware of the "big problems" at ARMC that had resulted from the controversy between Ms. Sweeney and the AWC doctors. Elder Dep. pp. 36–37. The AO & G doctors informed certain officials at St. Mary's that they did not want Ms. Sweeney or her students to have access to patients under their care at St. Mary's. *Id.* at pp. 35–39. Initially, officials at St. Mary's informed Ms. Sweeney that she would not be permitted to teach at their facility. Sweeney Dep., pp. 338–39. On December 8, 1986, however, the officials at St. Mary's reversed their earlier decision and announced that they would allow Ms. Sweeney to teach at St. Mary's. *Id.* at p. 340.

Before Ms. Sweeney began teaching at St. Mary's, the AO & G doctors met with her and demanded that she agree not to discuss home birth with any patients under their care at St. Mary's. Deposition of William V. Crosby, M.D., pp. 20–24. Apparently, these doctors had never made such a demand of any other MCG instructor. According to Ms. Sweeney, even though she was allowed to teach at St. Mary's, at least some of the AO & G doctors remained uncooperative and openly hostile towards her.

### III. DISCUSSION

#### A. COUNT II—THE SHERMAN ACT

In connection with her antitrust claim, Ms. Sweeney alleges that the acts of the Defendants constituted a combination and conspiracy to restrain trade and a concerted refusal to deal in violation of Section One of the Sherman Act, 15 U.S.C.A. § 1.

**1570**

Complaint ¶¶ 26–34. Specifically, Ms. Sweeney contends that she was restrained in both her teaching profession and in her private nurse-midwife practice. *Id.* AWC, AO & G, and the Defendant doctors have raised several defenses to Ms. Sweeney's Sherman Act claim. These defenses are addressed below.

### 1. *Jurisdiction/Interstate Commerce*

■ The law is clear in this circuit that "[t]o invoke the jurisdiction of the Sherman Act, ... a plaintiff [must] show (1) that the local activity has a (2) substantial effect on (3) interstate commerce." *Shahawy v. Harrison,* 778 F.2d 636, 639 (11th Cir. 1985). In making a determination on the jurisdictional question, the court must look first to "the relationship between the defendant's business and interstate markets, in particular the effect the defendant's business will have on those markets." *Id.* at 640 n. 5, *quoting Constr. Aggregate Transp., Inc., v. Florida Rock Indus., Inc.,* 710 F.2d 752, 767 n. 31 (11th Cir.1983) (hereinafter cited as *CAT*). Jurisdiction under the Sherman Act does not require that the alleged unlawful activities actually occur in interstate commerce. *CAT,* 710 F.2d at 766. Rather, jurisdiction is established if the defendant's business activities as a whole have a substantial or not insubstantial effect on interstate markets. *Shahawy,* 778 F.2d at 640–41.[2]

If the defendant's business activity alone does not satisfy the jurisdictional requirement, the court also may look to the plaintiff's relationship with interstate markets. *Shahawy,* 778 F.2d at 640–41 n. 5; *CAT,* 710 F.2d at 767 n. 31. "Thus, when determining whether interstate commerce is affected by an alleged violation, courts will often examine both the defendant's relationship with interstate markets and the plaintiff's." *CAT,* 710 F.2d at 767 n. 31. Moreover, a plaintiff may satisfy the jurisdictional requirement of the Sherman Act "by proving either that the business activities *occurred* in commerce *or* that those activities *had an effect* on [interstate] commerce." *CAT,* 710 F.2d at 766, *citing McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980) (emphasis added).

■ Defendants contend that Ms. Sweeney has failed to show the requisite effect on interstate commerce necessary to establish jurisdiction under the Sherman Act. In support of their argument, Defendants rely on a Seventh Circuit case, *Doe on Behalf of Doe v. St. Joseph's Hosp.,* 788 F.2d 411 (7th Cir.1986). In *Doe* the court held that the plaintiff had not satisfied the jurisdictional requirement even though she had alleged that the defendants (1) purchased drugs, medical supplies, and equipment which travel in interstate commerce; (2) received payments of medical bills from out-of-state insurance programs; (3) provided medical services to out-of-state residents; and (4) shared information and medical training across state lines. *Id.* at 417. The *Doe* court found these allegations to be insufficient since in the Seventh Circuit, a plaintiff bringing an antitrust claim " 'must allege sufficient facts *concerning the alleged violation and its likely effect on interstate commerce*' " to establish jurisdiction under the Sherman Act. *Id., quoting Seglin v. Esau,* 769 F.2d 1274, 1280 (7th Cir.1985) (emphasis added).

As noted earlier, a plaintiff bringing a Sherman claim in this circuit need not show that the alleged unlawful activity had an effect on interstate commerce. *Shahawy,* 778 F.2d at 641; *CAT,* 710 F.2d at 766. In *Shahawy* a panel of the Eleventh Circuit held that the following allegations satisfied the jurisdictional requirements of the Sherman Act:

> The Defendant physicians treat a substantial number of patients from out-of-state, receive a substantial portion of their revenues from out-of-state private and public insurance entities, and purchase substantial amounts of medical equipment and supplies from out-of-state. Their activities substantially affect interstate commerce.

---

**2.** In *Shahawy* the Eleventh Circuit held that the terms "substantial" and "not insubstantial" are interchangeable in Sherman Act parlance. *Shahawy,* 778 F.2d at 641.

. . . .

The Plaintiffs provide medical services to patients, a substantial number and proportion of whom travel to Sarasota from other states. The Plaintiffs receive a substantial amount and portion of their revenues from out-of-state insurance companies and from Washington, D.C., in the form of Medicare and Medicaid payments. The Plaintiffs purchase [a] large amount and proportion of their medicines and supplies from out-of-state.

*Shahawy,* 778 F.2d at 641 n. 6. Thus, many of the allegations found insufficient to establish Sherman Act jurisdiction by the *Doe* court have been found sufficient to establish such jurisdiction in this circuit.

In the instant case, the evidence shows that (1) the AO & G doctors receive at least 29% of their gross income from out-of-state insurance payors; (2) the AO & G doctors pay at least 30% of their monthly expenditures to out-of-state entities; and (3) the AO & G doctors purchase at least 49% of all the drugs used in their practice from out-of-state entities. The evidence also shows that (1) the AWC doctors receive 33% of their gross income from out-of-state payors; (2) the AWC doctors pay 30% of their monthly expenditures to out-of-state entities; and (3) the AWC doctors purchase at least 10–15% of their drugs from out-of-state vendors. After considering this evidence and the Eleventh Circuit's holdings in *CAT* and *Shahawy,* this court finds that Ms. Sweeney has shown that the Defendant's business activities have a substantial or not insubstantial effect on interstate commerce.

Assuming arguendo that Defendant's activities did not satisfy the jurisdictional requirements of the Sherman Act, this court would then be required to look also at Ms. Sweeney's relationship with interstate markets. In *CAT* the court noted that it "makes good sense" to consider the plaintiff's relationship with interstate markets since an "injury to the plaintiff may result

directly in injury to the market." *CAT,* 710 F.2d at 767 n. 31. Looking to Ms. Sweeney's activities, the evidence shows that in connection with her "Family Birth" practice, Ms. Sweeney purchased 90% of her midwifery supplies and equipment from out-of-state vendors. Affidavit of Deborah Sweeney, ¶ 2 (this Affidavit is attached as Plaintiff's Exhibit D to Ms. Sweeney's Supplemental Brief on Interstate Commerce). Ms. Sweeney contends that "[b]ut for the defendants' conspiring to restrain [her] business, the volume of [her] impact upon interstate commerce would have increased." Supplemental Brief on Interstate Commerce, pp. 7–8. Thus, Ms. Sweeney argues that the injury to her resulted directly in an injury to the market. This court, however, need not decide whether Ms. Sweeney's relationship to interstate markets, standing alone, would satisfy the jurisdictional requirements of the Sherman Act. Even if her relationship alone would be insufficient, when combined with the business activities of the Defendant doctors, this court finds that Ms. Sweeney has sufficiently shown that such activities have a substantial effect on interstate commerce.[3]

### 2. *Evidence of a Conspiracy*

■ Defendants contend that Ms. Sweeney has failed to show the existence of a contract, combination, or conspiracy as required under Section One of the Sherman Act. The Defendant doctors argue that "there is *absolutely* no evidence that [they] have conspired among themselves or with anyone else to either raise prices *or* prevent [Ms. Sweeney] or anyone under her supervision from teaching at Athens Regional or St. Mary's Hospitals." Brief in Support of AO & G and its Doctors' Motion for Summary Judgment, p. 9 (emphasis in original). In addition to the alleged lack of evidence of a conspiracy, the Defendant doctors refer to their affidavits in which

---

**3.** Ms. Sweeney recently filed a motion to compel certain documents to support her position on interstate commerce. Ms. Sweeney stated in her motion that in the event the court ruled in her favor on the interstate commerce defense, the motion would be withdrawn. Since the court has ruled in Ms. Sweeney's favor on this issue, the court will not rule on the motion to compel.

each one stated that (1) he or she never discussed or attempted to raise prices of obstetrical/gynecological care in concert with any other obstetrician/gynecologist in the Athens area, and (2) he or she at no time took actions with any other physician to conspire against Ms. Sweeney.

To prove a conspiracy under the Sherman Act, the plaintiff must be able to produce evidence that reasonably tends to prove the defendants " 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Monsanto Co., v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984), *quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). In other words, the circumstances must reveal "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). In addition, the plaintiff must produce evidence "that tends to exclude the possibility that [the defendants] were acting independently." *Monsanto Co.,* 465 U.S. at 764, 104 S.Ct. at 1471.

In the instant case, Ms. Sweeney has produced sufficient evidence to raise a factual question as to whether the Defendant doctors were involved in a conspiracy to unreasonably restrain her teaching duties and home-birth business. First, Ms. Sweeney has produced a letter written by the Chiefs of the Departments of Obstetrics for both Athens Hospitals which states that Ms. Sweeney's home-birth practice "must be eliminated." This letter was the result of a joint departmental meeting that was attended by doctors from AWC and doctors from AO & G. Along with this letter, Ms. Sweeney has produced the minutes of a meeting held in 1978 by the OB–GYN Department at ARMC which shows that a motion was made that " '[a]ny physician who participates in planned out of hospital deliveries will not be a member of the OB–GYN Staff nor should he be a member of the Hospital Staff.' " (this document is attached as Exhibit J to Plaintiff's Supplemental Brief on Interstate Commerce). Although this meeting was held long before Ms. Sweeney arrived in Athens, factual questions exist as to whether this motion was adopted, whether it was in effect during the period of time relevant to this lawsuit, and if so, whether it shows a conspiracy on the part of the Defendant doctors to restrain Ms. Sweeney's home-birth practice.

In addition to the letter and minutes, there is deposition testimony in the record that can be viewed as supporting Ms. Sweeney's theory of a conspiracy. As noted earlier in this Order, under the laws of the State of Georgia, midwives may not deliver babies without the consent of a physician to provide back-up. Dr. Shah testified that the Department of OB–GYN at ARMC had adopted a position that prohibited its physicians from providing back-up for home deliveries. Shah Dep., pp. 122–23. Eventually, after discussions with "several physicians," Dr. Shah also decided to stop providing back-up for Ms. Sweeney. Letter from Dr. Shah to Ms. Sweeney and Ms. Hathaway, dated Sept. 17, 1985 (attached as Defendant's Exhibit 16 to Dr. Shah's deposition). Ms. Sweeney further states that not one of the Defendant doctors has ever agreed to provide back-up for her. In addition, Ms. Sweeney testified that although Dr. Goggin had agreed originally to provide back-up for Ms. Sweeney's clients, he too was pressured into reneging on his agreement. Sweeney Dep., pp. 569–72. Such evidence could persuade a jury to find that the Defendant doctors conspired together in an attempt to force Ms. Sweeney out of business.

Finally, the testimony is undisputed that the AWC doctors refused to let Ms. Sweeney or any of her students care for their patients at ARMC, and that initially, the AO & G doctors attempted to prohibit Ms. Sweeney from teaching at St. Mary's. After considering all the evidence, the court finds that reasonable minds could differ on the question of whether these Defendant doctors were involved in a combination or conspiracy to restrain Ms. Sweeney's trade. The evidence also "tends to exclude the

possibility that the [defendants] were acting independently." *Monsanto Co.*, 465 U.S. at 764, 104 S.Ct. at 1471. Because the evidence raises factual questions concerning the alleged conspiracy, summary judgment must be denied to the doctors on their defense of "no evidence of a conspiracy."[4]

### 3. *Antitrust Injury*

■ In paragraph 34 of her Complaint, Ms. Sweeney contends that she is entitled to recover treble damages, costs of suit, and reasonable attorney's fees under Section Four of the Clayton Act, 15 U.S.C.A. § 15. To recover under this Section, the plaintiff must show that she was "injured in [her] business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C.A. § 15 (Supp.1988). Ms. Sweeney alleges that she has been injured in her teaching profession in that she and her students have been precluded from caring for patients at ARMC, and in her private home-birth practice in that she

has lost patients and potential patients, money and fees, and the opportunity to compete for patients with the Defendant doctors. Complaint ¶¶ 32–33. Defendants contend that Ms. Sweeney lacks standing to sue since she has failed to prove the kind of antitrust injury contemplated under the Clayton Act.

The Eleventh Circuit has construed Section Four of the Clayton Act to mean "actual injury" to one's business or property. *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1492–93 (11th Cir.1985), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986). The injury must be of the type the antitrust laws were intended to prevent, and it must occur as a result of the defendants' unlawful conduct. *Id.* at 1493; *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). In other words, for a plaintiff to establish that she has standing to bring a claim for dam-

---

**4.** Ms. Sweeney contends that the Defendants' conspiracy and "concerted refusal to deal with [her] in order to exclude competition" is a *per se* violation of Section One of the Sherman Act. *See* Complaint, ¶ 29. Conversely, Defendants contend that the conduct alleged to be unlawful in this case does not fall under one of the categories addressed under the *per se* test, and therefore, the conduct should be analyzed under the rule of reason test. The practical difference between these two tests is that under the *per se* rule, the plaintiff is not required to demonstrate by quantifiable evidence that competition has been reduced in a relevant product and geographic market. *CAT,* 710 F.2d at 771–72.

The *per se* rule is applied to horizontal agreements between merchants that affect the price of goods or services or the workings of the marketplace. *See generally N.C.A.A. v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 99–100, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984). Such horizontal agreements can take the form of concerted refusals to deal. *See Fashion Originators Guild of America v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). As the Eleventh Circuit has noted, "the touchstone of an illegal group boycott or concerted refusal to deal is the agreement between two or more merchants not to deal with another merchant when, in the absence of such an agreement, the conspiring merchants would normally have been free to deal with that merchant." *CAT,* 710 F.2d at 774.

In the instant case, the evidence shows that the AWC doctors and the AO & G doctors were

the two primary competitors for labor/delivery services in the Athens area. The evidence also shows that these two groups of doctors control a significant percentage of the labor/delivery market in the Athens area. Ms. Sweeney contends that these two groups of competitors conspired together to restrict her access to potential clients and to persuade other physicians to refuse to provide back-up for her "Family Birth" practice. The court finds that the unlawful conduct alleged here is closely akin to a horizontal agreement between merchants to refuse to deal with another merchant, and therefore, should be analyzed under the *per se* test.

Ms. Sweeney also argues that even if the court chose to apply the rule of reason test to these facts, she would not be required to present proof of the specific product and geographic markets since this case involves a horizontal agreement among competitors. The court need not decide this issue at this time since it has ruled that the case should proceed to trial under the *per se* test. Although the court has ruled for purposes of summary judgment that the *per se* test applies, however, it will consider in more detail at trial whether this case should be submitted to the jury on the basis of the *per se* test or the rule of reason test. The court's willingness to consider charging the jury on the rule of reason test is based on language from a 1972 Supreme Court case which states: "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Assoc., Inc.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).

ages under Section Four of the Clayton Act, she must show that the injury she has suffered bears a close relationship to the alleged antitrust violation. *Amey,* 758 F.2d at 1493; *see CAT,* 710 F.2d at 782. Once the plaintiff establishes the causal relationship between her injury and the alleged unlawful conduct, the burden of proving the actual *amount* of damages "is much less severe." *See CAT,* 710 F.2d at 785.

To establish the "close relationship" between the injury and the conduct, the plaintiff must show that she "is within the market endangered by the alleged anticompetitive conduct" and that the "injury occurred within that market." *Amey,* 758 F.2d at 1500. Under this "target area test," the court will identify the area of the economy threatened by the alleged antitrust conduct and then determine whether the plaintiff's injury occurred within that target area. *Id.* at 1496. In the instant case, the area of the market affected is the market for obstetrical/gynecological services, in particular, the market for delivering babies, in the Athens, Georgia area. There are two primary hospitals in this market area, ARMC and St. Mary's. The AWC doctors handle a majority of the deliveries at ARMC, and the AO & G doctors handle a majority of the deliveries at St. Mary's. Since Ms. Sweeney's "Family Birth" practice was competing as a childbirth alternative in the Athens, Georgia area, she was within the target area, *i.e.,* the market endangered by the alleged antitrust violation.

Following identification of the market affected, the court must determine whether the injury actually occurred within the target area. *Amey,* 758 F.2d at 1499. Ms. Sweeney contends that she lost clients and potential clients, as well as money and fees, as a result of the Defendants' conduct. The clients Ms. Sweeney claims to have lost would likely have employed the services of the doctors of AWC or AO & G, or another midwife. In essence, Ms. Sweeney contends that since the Defendant doctors restricted her access to patients and attempted to persuade other physicians to cease performing back-up for "Family Birth" clients, she lost potential clients for whom she was competing in the Athens, Georgia area. Therefore, the evidence shows that Ms. Sweeney's alleged injury occurred within the target area, and it was one the antitrust laws were intended to prevent.

After considering the arguments of the parties, the court finds that Ms. Sweeney has established the close relationship between her injury and the alleged unlawful conduct as required by the "target area test." The court notes, however, that at this point in the litigation, Ms. Sweeney's proof of the *amount* of her actual damages is quite slim. For example, Ms. Sweeney testified that she is teaching at St. Mary's, and that she has continued to serve clients in her home-birth practice. Sweeney Dep., p. 39. In fact, the evidence shows that Ms. Sweeney's home-birth practice actually has grown since the alleged unlawful conduct took place. *Id.* at pp. 39, 79. As noted earlier, however, the burden of proving the amount of damages is "much less severe" than the burden of proving the defendants' alleged unlawful conduct actually *caused* the damages. *See CAT,* 710 F.2d at 785. Because Ms. Sweeney has adequately established causation, and because the court cannot now rule as a matter of law that Ms. Sweeney can prove no actual damage to her or her business, the court must deny summary judgment on the Defendant doctors' "no antitrust injury" defense. The court notes, however, that Ms. Sweeney has the obligation at trial to prove the amount of the actual damage she sustained as the result of the Defendants' allegedly unlawful conduct.

### 4. *Justification*

Defendants also argue that they were "justified" in any actions they may have taken against Ms. Sweeney. Defendants raise two defenses in support of their justification argument. First, Defendants contend that they are protected by the patient care defense; and second, Defendants contend that Ms. Sweeney "has no standing to sue" since she was conducting an "illegal business." Defendants assert these justifications as an absolute defense to Ms. Sweeney's antitrust claim.

■ The court will address first the patient care defense. Defendants rely on a Seventh Circuit case in which the court held as follows:

> an individual medical doctor is free to act on [his] belief [about chiropractic medicine] by declining to associate with a particular chiropractor in the care of a particular patient. It seems reasonable that two or three medical doctors, sharing this view and working as a team in the care of a particular patient, would be free to agree, and to act on the agreement, to decline to associate with a particular chiropractor in the care of that patient.

*Wilk v. American Medical Ass'n.*, 719 F.2d 207, 226 (7th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2398, 2399, 81 L.Ed.2d 355 (1984). Although the circuit court remanded the case to the trial court because of faulty jury instructions, Defendants contend that the circuit court's holding created a patient care defense. Defendants urge this court to apply a similar defense to this case, and thereby absolve Defendants from any liability on the Sherman Act claim.

The court notes, and Defendants concede, that the *Wilk* decision is not binding on this court. Moreover, Defendants have cited no binding precedent in which the patient care defense has been adopted and applied to antitrust actions. Even if such binding precedent had been cited, however, the court finds in this case that material factual questions exist as to whether Defendants were motivated by a concern for their patients or by a desire to eliminate Ms. Sweeney as a competitor. Consequently, the court could not grant summary judgment in favor of Defendants on the patient care defense even if that defense was the law in this circuit.[5]

■ In addition to the patient care defense, Defendants also contend that they cannot be held liable under the Sherman Act since Ms. Sweeney was engaged in an "illegal business." First, the court notes that several factual questions exist on the issue of whether Ms. Sweeney was conducting an illegal business.[6] Consequently, the court is not in a position to grant summary judgment in favor of Defendants on their argument that their conduct was somehow justified because of Ms. Sweeney's alleged illegal conduct. But more importantly, the Supreme Court has held that the alleged illegal conduct of an antitrust plaintiff does not justify an unlawful conspiracy being carried out by the defendants. *See Keifer–Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951) (alleged illegal conduct of plaintiff "could not legalize the unlawful combination by [defendants] nor immunize them against liability to those they injured"); *Fashion Originators' Guild,* 312 U.S. at 468, 61 S.Ct. at 708 (even if conduct of retailers was "an acknowledged tort under the law of every state, that situation would not justify petitioners in combining together to regulate and restrain interstate commerce in violation of federal law"). Therefore, even if the factual questions concerning the illegality of Ms. Sweeney's business did not exist, Supreme Court precedent seems to indicate that Ms. Sweeney's alleged illegal conduct would not be a viable defense to her antitrust claim.

### 5. *Burden of Proof*

■ Defendants further argue that Ms. Sweeney has failed to meet her burden of proof under 15 U.S.C. § 1. The court disagrees. Under *Monsanto, supra,* the plaintiff must present evidence to exclude the possibility that the alleged conspirators

---

**5.** This court also notes that Supreme Court precedent seems to cut against the application of a patient care defense. The Supreme Court has held in at least one case that a "threat to public safety" argument will not justify an unlawful conspiracy in restraint of trade. *See Nat'l Soc'y of Professional Eng'r v. United States,* 435 U.S. 679, 695–96, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978) ("[e]xceptions to the Sher-

man Act for potentially dangerous goods and services would be tantamount to a repeal of the statute.... The judiciary cannot indirectly protect the public against this harm by conferring monopoly privileges on the manufacturers").

**6.** The "illegal business" argument is discussed more fully in section E of this Order.

acted independently. *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471. The plaintiff must be able to show that the defendants had a "conscious commitment" of a unity of purpose in carrying out an unlawful objective. *Id.* Ms. Sweeney has satisfied this burden. The evidence shows that the Defendant doctors had joint meetings and wrote a joint letter calling for the elimination of Ms. Sweeney's home-birth practice. The court finds that this evidence, along with other factual allegations referred to throughout this Order, is sufficient to allow a jury to conclude that some or all of the Defendants were involved in an unlawful conspiracy to restrain Ms. Sweeney's trade.

### 6. *Incapable of Conspiring*

■ In addition to the defenses set forth above, the AWC doctors contend that they are incapable of conspiring with each other for purposes of the Sherman Act. The doctors point out that AWC is a partnership and they are its partners. Citing *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 356, 102 S.Ct. 2466, 2479, 73 L.Ed.2d 48 (1982), these doctors contend that they are incapable of conspiring under the Sherman Act since a partnership is a single entity.

The court need not decide whether the individual partners of AWC can be viewed as separate entities for purposes of Sherman Act liability. Quite simply, even if AWC and its doctors comprise a single entity, the alleged conspiracy in this case involves both the AWC doctors and the AO & G doctors. These two groups of doctors are completely separate and independent entities that are fully capable of conspiring with one another for purposes of the Sherman Act. Moreover, any individual member of one group is capable of conspiring with an individual member of the other group for purposes of the Act. Consequently, this argument is of no avail to the AWC doctors.

### 7. *State Action Exemption*

■ As a final defense to Ms. Sweeney's Sherman Act claim, the AWC doctors argue that they are immune from liability under the state action exemption established by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). To be entitled to state action immunity, a private party must make two separate showings: (1) that he was acting pursuant to a clearly articulated and affirmatively expressed state policy " 'to displace competition with regulation or monopoly public service.' " *Wall v. City of Athens*, 663 F.Supp. 747, 752 (M.D.Ga. 1987), *quoting City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413, 98 S.Ct. 1123, 1137, 55 L.Ed.2d 364 (1978); and (2) that the state actively supervises the anticompetitive conduct. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105–06, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). The court finds that the AWC doctors have failed to establish the first prong of this test, and therefore, they are not entitled to state action immunity.

In its Order of February 3, 1989, this court found that Defendant ARMC was entitled to *Parker* immunity. *Sweeney*, 705 F.Supp. at 1563. The court found that the State of Georgia has established a clearly articulated policy authorizing the type of conduct ARMC had exhibited in limiting Ms. Sweeney's access to certain patients at its Hospital. *Id.* at 1563. The AWC doctors, however, have failed to show this court that the State of Georgia has articulated a clearly established policy that authorizes a group of physicians to prohibit a licensed nursing school instructor from working with their patients, or that authorizes two groups of physicians to conspire against a certified nurse-midwife in an attempt to limit her access to patients and persuade other physicians to stop performing back-up for her. Absent a clearly articulated state policy authorizing the type of conduct alleged to be present in this case, the AWC doctors are not entitled to the protection of state action immunity.[7]

---

**7.** The AWC doctors also rely on *Bolt v. Halifax Hosp. Medical Center*, 851 F.2d 1273 (11th Cir. 1988), in support of their argument that they are entitled to the *Parker* exemption. The court

For the reasons set forth fully above, the court finds that Ms. Sweeney has successfully responded to the defenses raised by AWC, AO & G, and the Defendant doctors on the Sherman Act claim. Accordingly, summary judgment is DENIED to these Defendants on Count II of Ms. Sweeney's Complaint.

**B. COUNT IV—CONSPIRACY IN RESTRAINT OF FREE AND OPEN COMPETITION UNDER O.C.G.A. § 16–10–22**

■ In Count IV of her Complaint, Ms. Sweeney contends that the Defendant doctors violated O.C.G.A. § 16–10–22 when they prohibited her and her students from treating certain patients at ARMC. This statute provides in pertinent part:

> A person who enters into a contract, combination, or conspiracy in restraint of trade or in restraint of free and open competition *in any transaction with the state or any agency thereof,* ... shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years....

O.C.G.A. § 16–10–22(a) (1988).

The Defendant doctors argue that this statute does not apply to the instant case. The court agrees. O.C.G.A. § 16–10–22 is a criminal statute that prohibits an individual or corporation from unlawfully restraining competition in transactions involving the State. It covers such situations as contract bidding for public work projects. *See State v. Shepherd Constr. Co., Inc.,* 248 Ga. 1, 281 S.E.2d 151 (1981). The instant case involves a private dispute between a nurse-midwife and two groups of physicians. Ms. Sweeney's allegations do not involve any transactions with the State, and consequently, O.C.G.A. § 16–10–22 does not provide a basis of relief for Ms. Sweeney.

Accordingly, summary judgment is GRANTED in favor of AWC, AO & G, and all Defendant doctors on Count IV of Ms. Sweeney's Complaint.

**C. COUNT VI—TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS**

In Count VI Ms. Sweeney contends that AWC, AO & G, and the Defendant doctors tortiously interfered with her contractual and business relationships with ARMC and St. Mary's when they prevented her and her students from caring for certain patients at ARMC. Defendants contend that the facts in this case do not give rise to a claim for tortious interference with contractual and business relationships, or in the alternative, that the alleged "interference" was privileged.[8]

■ Count VI actually raises two separate claims: (1) tortious interference with contractual relationships; and (2) tortious interference with either present or prospective business relationships. To state an actionable claim for interference with contractual rights, the plaintiff must prove (1) the existence of a contractual relationship; (2) interference by the defendants; and (3) resulting damage to the contractual relationship. *Stamps v. Ford Motor Co.,* 650 F.Supp. 390, 402 (N.D.Ga. 1986). To state an actionable claim for interference with business relationships, the plaintiff must prove that the defendant

notes, however, that the *Bolt* decision has been vacated, and a rehearing *in banc* has been granted. *Bolt v. Halifax Hosp. Medical Center,* 861 F.2d 1233 (11th Cir.1988). The Eleventh Circuit granted the rehearing *in banc* specifically to reconsider whether the defendant hospitals and their medical staffs were exempt from antitrust liability under the state action exemption. Consequently, the earlier *Bolt* decision is of no avail to the doctors. The rehearing was scheduled for March 1, 1989, but as of the date of this Order, the Eleventh Circuit has not yet issued its *in banc* opinion.

8. Ms. Sweeney has filed a recent Motion to Amend her Complaint in which she seeks to add various claims under Count VI. Specifically, Ms. Sweeney seeks to allege that the Defendants interfered with the following: (1) her business relationships and prospective business relationships with back-up physicians; (2) her contractual relationships and prospective business relationships with certain clients; and (3) her business relationship with her partner in "Family Birth," Amy Hathaway. The court has not ruled on Ms. Sweeney's latest Motion to Amend, and the claims stated therein are not presently before this court for consideration.

(1) acted improperly and without privilege; (2) acted purposely and with malice with the intent to injure; (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff; and (4) caused some financial injury to the plaintiff. *Hayes v. Irwin,* 541 F.Supp. 397, 429 (N.D.Ga.1982), *aff'd,* 729 F.2d 1466 (11th Cir.1984).[9]

■ The evidence in this case shows that under the terms of a written contract entered into by ARMC and MCG, ARMC was to provide "adequate clinical facilities" for nursing students participating in MCG's School of Nursing at Athens (SONAT) program. *See* Letter from Mary E. Conway, Ph.D. to John Drew, dated Mar. 7, 1986 (attached as Plaintiff's Exhibit 6 to Dr. Elder's deposition). As an instructor in the SONAT program, Ms. Sweeney operated under, and was a third-party beneficiary of this contract. In preventing Ms. Sweeney and her students from seeing certain patients at ARMC, the Defendant doctors so limited Ms. Sweeney's teaching capability at ARMC that she was forced to continue the SONAT program at another hospital in the Athens area. The evidence further shows that Ms. Sweeney met some opposition from the AO & G doctors at the time she began teaching at the other hospital. The court finds that this evidence presents factual questions as to whether the conduct of the Defendants constituted an interfer-

ence with the ARMC/MCG contract, and if so, the extent to which Ms. Sweeney was damaged by such interference.

■ Defendants argue, however, that summary judgment should be granted in their favor on the claims asserted in Count VI because Ms. Sweeney has failed to show that any of the Defendants acted intentionally or maliciously. The court disagrees. To show malice the plaintiff need only prove that the act was done with knowledge of the plaintiff's rights and with the intent to interfere with those rights. *Hayes,* 541 F.Supp. at 429. This court cannot discern the knowledge or intent of the parties based on conclusory allegations made in briefs in support of summary judgment. Indeed, whether the Defendants in this case acted intentionally or with malice are factual questions that must be decided by a jury.

■ Defendants also argue that summary judgment should be granted in their favor on Count VI since their actions were privileged. Specifically, Defendants contend that their decision to limit Ms. Sweeney's access to certain patients at ARMC cannot give rise to a claim of tortious interference if the decision was made to protect the patients. According to the Defendants, physicians are "empowered to protect their patients from others whose influence they consider harmful." AWC's Brief in Sup-

---

**9.** Initially, the court had some concern as to whether tortious interference with business relationships was an actionable tort under Georgia law. In *Carolina Furniture Co., Inc. v. Rhodes, Inc.,* 603 F.Supp. 69 (S.D.Ga.1984), Judge Bowen made the following observation concerning the tort of malicious interference with business relations:

> It is far from clear whether Georgia recognizes such a cause of action. It is the federal decisions interpreting Georgia law, not the decisions of Georgia's own courts, that have extended protection to unilateral business expectations. Absent some clearer signal from the Georgia courts, I am reluctant to grant relief under the facts of this case. I am not free under the *Erie* doctrine to create remedies that do not exist under state law. Accordingly, I conclude that plaintiff's attempt to fall back onto the tort of tortious interference with business relations must fail.

*Id.* at 77 (citations omitted). After reviewing the case law, however, it appears to this court

that Georgia courts do in fact recognize the tort of malicious interference with business relations. *See Korengay v. Mundy,* Case No. 77702 (Ga.App. Feb. 22, 1989) (alleged conduct insufficient as a matter of law to support an action for tortious interference with a business relationship); *Slautterback v. Intech Management Serv.,* 247 Ga. 762, 766, 279 S.E.2d 701, 704 (1981) (appellant "engaged in a malicious, unjustified campaign to destroy the Underwriters' sales network"); *Architectural Mfg. Co. of America v. Airotec, Inc.,* 119 Ga.App. 245, 249–50, 166 S.E. 2d 744, 747 (1969) ("while even the destruction of a competing business by means of attracting its customers in the fair course of trade is not actionable, destruction or substantial injury by means of attracting away all or a large percentage of personnel ... is compensable"). Since Georgia case law seems to recognize a cause of action for malicious interference with business relations, this court will allow Ms. Sweeney to pursue such a claim in this action.

port of Motion for Summary Judgment, p. 28. Defendants, however, have cited no case in which this "physician/patient" privilege has been invoked to justify the alleged interference with a contractual or business relationship. Even if such a privilege existed under Georgia law, the evidence before the court presents a factual question as to whether the decision of the doctors was made in good faith to protect their patients, or as the result of malice and ill-will toward Ms. Sweeney and her home-birth philosophy.[10]

Accordingly, summary judgment is DENIED to all Defendants on Count VI of Ms. Sweeney's Complaint.

## D. COUNT VII—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ In Count VII of her Complaint, Ms. Sweeney alleges that the conduct of the Defendants constituted intentional infliction of emotional distress in violation of Georgia law. Complaint ¶ 53. The rule is well established in this State "that in order to sustain a cause of action for the tort of intentional infliction of emotional distress, the defendant's actions must have been so terrifying or insulting as naturally to humiliate, embarrass or frighten the plaintiff." *Moses v. Prudential Ins. Co. of America,* 187 Ga.App. 222, 224–25, 369 S.E.2d 541, 542 (1988); *see e.g., Greer v. Medders,* 176 Ga.App. 408, 409, 336 S.E.2d 328, 329 (1985). In other words, "the conduct [must] be of such serious import as to *naturally* give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress." *Moses* at 225, 369 S.E.2d at 543 (emphasis in original).

In its Order of February 3, 1989, the court addressed the intentional infliction of emotional distress claim as it applied to Defendant ARMC. The court found that ARMC's decision to enforce the Defendant doctor's request that Ms. Sweeney's access to certain patients be restricted did not give rise to an actionable claim for intentional infliction of emotional distress under Georgia law. *Sweeney,* 705 F.Supp. at 1571–72. The court noted that no insulting language was used when officials from ARMC informed Ms. Sweeney of their decision, nor was there any evidence that these officials in any way harassed Ms. Sweeney at any time. *Id.* at 1572.

The allegations against the Defendant doctors, however, are different in scope. Although paragraph 53 of the Complaint only describes the action of preventing Ms. Sweeney from teaching at ARMC or St. Mary's, it is apparent to this court that Ms. Sweeney intends to rely on Dr. Mercer's statements and certain other actions of the Defendant doctors in support of her claim for intentional infliction of emotional distress. Specifically Ms. Sweeney relies on allegations that certain of the Defendant doctors pressured back-up physicians into severing their relationships with Ms. Sweeney, as well as allegations that the AO & G doctors attempted to bar Ms. Sweeney from teaching at St. Mary's.[11]

The court realizes that a defendant's conduct must be egregious to support a claim for intentional infliction of emotional distress. In this case Ms. Sweeney has alleged that she was exposed to several insulting and humiliating comments in the presence of those with whom she had a daily working relationship. One of the accusations, practicing illegal medicine, was not only insulting, but also constitutes a felony under Georgia law. In addition, Ms. Sweeney alleges that the Defendant doctors were the motivating force behind persuading other physicians to stop perform-

**10.** The doctors connected with AO & G also contend that they cannot be held liable on the tortious interference with contractual rights' claim since they were not aware of the contract existing between ARMC and MCG. The court is of the opinion, however, that there is sufficient evidence in the record to allow a fair-minded jury to find that these doctors were in fact aware of the contract.

**11.** Although these actions were not specifically set forth under Count VII of the Complaint, they were alleged in other paragraphs of the Complaint and incorporated into Count VII. *See* Complaint, ¶¶ 21–23, 48–49, 52.

ing back-up for her home-birth practice. After considering all the evidence, the court finds that a factual question exists as to whether the combined acts of the Defendant doctors resulted in the intentional infliction of emotional distress.

For these reasons, summary judgment is DENIED to AWC, AO & G, and the Defendant doctors on Count VII of Ms. Sweeney's Complaint.

## E. COUNT I—SLANDER

■ Ms. Sweeney's slander claim arises out of the verbal exchange between her and Dr. Mercer at the ARMC nurses' station on January 16, 1986. She brings her slander claim not only against Dr. Mercer, but also against all those Defendant doctors connected with AWC. Ms. Sweeney does not assert a slander claim against the AO & G doctors.

The relevant Georgia statute provides in pertinent part:

(a) Slander or oral defamation consists in:

(1) Imputing to another a crime punishable by law: [or]

\*　　\*　　\*　　\*　　\*　　\*

(3) Making charges against another in reference to his trade, office, or profession, calculated to injure him therein.

O.C.G.A. § 51–5–4(a)(1), (3) (1982). These two categories of slander are actionable *per se,* and a plaintiff need not prove special damages to support a claim under either one of these two categories. O.C.G.A. § 51–5–4(b) (1982). To recover on a *per se* slander claim, however, the plaintiff must show that the defendant's statements were both false and malicious. *Williams v.*

*Trust Co. of Georgia,* 140 Ga.App. 49, 49, 230 S.E.2d 45, 47 (1976).

■ AWC and its doctors argue that truth is an absolute defense to a slander claim, and summary judgment should be granted in their favor on Count I since Dr. Mercer's statements were true. The court agrees that truth is an absolute defense to a claim of slander; however, in most cases "truthfulness is a question of fact for the jury." *Hub Motor Co. v. Zurawski,* 157 Ga.App. 850, 852, 278 S.E.2d 689, 691 (1981). Although the AWC doctors have attempted to show on summary judgment that Dr. Mercer's statements were true as a matter of law, Ms. Sweeney has presented sufficient evidence to bring the truthfulness of the statements into question. For example, although Dr. Mercer allegedly accused Ms. Sweeney of "practicing illegal medicine," Ms. Sweeney contends that she practiced according to the standards set forth in those statutes and regulations applicable to her.[12] While Dr. Mercer allegedly accused Ms. Sweeney of practicing without a back-up physician, in her Affidavit Ms. Sweeney lists at least six physicians who provided back-up from the spring of 1985 through the fall of 1987. Affidavit of Deborah Sweeney, ¶¶ 11–16 (this Affidavit is attached as Exhibit 4 to Plaintiff's Brief in Opposition to Defendant Doctors' Motions for Summary Judgment). In addition, although Dr. Mercer allegedly accused Ms. Sweeney of exposing patients to unnecessary risks, failing to inform patients of risks, and being irresponsible for the welfare of her patients, the AWC doctors have failed to bring forth sufficient evidence to establish the truth of these allegations, and Ms. Sweeney contends they are false. *Id.* at ¶¶ 6, 18–20. And finally, although Dr.

---

**12.** The Defendant doctors contend that Ms. Sweeney violated several provisions of O.C.G.A. § 31–26–1 *et seq.,* and certain midwifery regulations established by the Department of Human Resources (DHR). Ms. Sweeney contends that neither O.C.G.A. § 31–26–1 *et seq.,* nor the DHR regulations apply to her since she is a certified nurse-midwife as opposed to a lay midwife. Ms. Sweeney contends that as a certified nurse-midwife, she is governed solely by the Nurse Practice Act and the regulations promulgated thereunder. *See* Letter from Michael M. McCann, CNM, to Peggy Brockington, dated

Sept. 20, 1988 (Mr. McCann is the Chapter Chair for the Georgia branch of the American College of Nurse–Midwives and his Letter is attached as Exhibit 2 to Plaintiff's Brief in Opposition to Defendant Doctors' Motions for Summary Judgment). At this time the record does not contain sufficient evidence to allow this court to make a ruling on which statutes and regulations govern certified nurse-midwives in the State of Georgia. Therefore, the court cannot rule as a matter of law that Ms. Sweeney was practicing illegal medicine.

Mercer allegedly accused Ms. Sweeney of being poorly trained as a nurse-midwife, the evidence shows Ms. Sweeney has a degree in nurse-midwifery from a well-respected graduate institution, and she has been licensed and certified as a nurse and midwife by the Georgia Board of Nursing and the American College of Nurse–Midwives respectively. *Id.* at ¶¶ 2–4. Clearly, the court is not in a position to decide the truth or falsity of Dr. Mercer's statements on motions for summary judgment.

■ The AWC doctors also contend that summary judgment should be granted in their favor on the slander claim since Dr. Mercer's statements were privileged. Specifically, these doctors rely on three conditional privileges set forth in O.C.G.A. § 51–5–7 (1982). The privileges relied on are as follows:

(1) statements made in good faith in the performance of a public duty.

(2) statements made in good faith in the performance of a legal or moral private duty; and

(3) statements made with a good faith intent on the part of the speaker to protect his interest in a matter in which he is concerned.

O.C.G.A. § 51–5–7(1)–(3) (1982). The statute makes it clear that good faith must be shown before any of these three privileges will apply. *Id.; see also Military Circle Pet Center No. 94, Inc. v. Cobb County,* 665 F.Supp. 909, 918 (N.D.Ga.1987). In deciding whether a statement was made in good faith, the factfinder must determine if the speaker was intending to protect legitimate interests or was merely venting private malice. *See Savannah News–Press, Inc. v. Hartridge,* 110 Ga.App. 203, 215–16, 138 S.E.2d 173, 181 (1964); *Lamb v. Federwitz,* 72 Ga.App. 406, 407, 33 S.E.2d 839, 841–42 (1945). As the statute and cases make clear, the question of privilege and good faith is inherently one for the jury.

■ Finally, the AWC doctors argue that the doctrine of *respondeat superior* is not applicable to an action for slander. They contend that neither AWC nor its individual partners directed or authorized Dr. Mercer to make the statements in question, and that if anyone is potentially liable on the slander claim, it is only Dr. Mercer.

The court agrees that the doctrine of *respondeat superior* does not apply to actions for slander. *See Burrow v. K–Mart Corp.,* 166 Ga.App. 284, 286–87, 304 S.E.2d 460, 463 (1983). Under the Uniform Partnership Act, however, a partnership is liable for the tort of any partner if the tort was committed in the ordinary course of the business of the partnership or with the authority of the tortfeasor's partners. O.C.G.A. § 14–8–13 (Supp.1988). In addition, under the Partnership Act, all partners are jointly and severally liable for all debts and obligations of the partnership. O.C.G.A. § 14–8–15 (Supp.1988).

In the instant case, Ms. Sweeney has presented sufficient evidence to raise a factual question as to whether Dr. Mercer's statements were made either in the ordinary course of the business of the partnership or with the authority of her partners. Before January 16th, Dr. Mercer and her partners met with other doctors and discussed Ms. Sweeney's home-birth business. This meeting resulted in a letter that cited the risks of home deliveries and questioned Ms. Sweeney's home delivery practice. Although the AWC doctors contend that they did not authorize Dr. Mercer to make the statements in question, based on the evidence in the record, a reasonable jury might disagree with the doctors' contention.

For these reasons, summary judgment is DENIED to AWC and its doctors on Count I of Ms. Sweeney's Complaint.

**F.  COUNT V—UNFAIR AND DECEPTIVE BUSINESS PRACTICES UNDER GEORGIA LAW**

Count V of Ms. Sweeney's Complaint alleges violations of Georgia's Uniform Deceptive Trade Practices Act (UDTPA), O.C.G.A. § 10–1–370 *et seq.,* and Georgia's Fair Business Practices Act of 1975 (FBPA), O.C.G.A. § 10–1–390 *et seq.* Specifically, Ms. Sweeney contends that the statements of Dr. Mercer on January 16, 1986, constituted a violation of these two statutes since

the statements were false and misleading, and disparaged Ms. Sweeney's goods, services, and business. Complaint ¶ 42. Ms. Sweeney asserts these claims only against those Defendant doctors connected with AWC.

The relevant portion of the UDTPA provides as follows:

(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

\* \* \* \* \* \*

(8) Disparages the goods, services, or business of another by false or misleading representation of fact.

O.C.G.A. § 10–1–372(a)(8) (1982). "A person likely to be damaged by a deceptive trade practice of another" may sue for injunctive relief and costs of litigation under the UDTPA. O.C.G.A. § 10–1–373(a), (b) (1982). In certain situations, the court also may assess attorney's fees against a party who has violated the UDTPA. O.C.G.A. § 10–1–373(b) (1982).

The relevant portion of the FBPA provides as follows:

(a) Unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful.

(b) By way of illustration . . . the following practices are declared unlawful:

\* \* \* \* \* \*

(8) Disparaging goods, services, or business of another by false or misleading representation.

O.C.G.A. § 10–1–393(a), (b)(8) (Supp.1988). Under the FBPA a successful claimant may obtain injunctive relief and recover general and exemplary damages. O.C.G.A.

§ 10–1–399(a) (Supp.1988). A claimant also may recover three times his actual damages if the violation was intentional, O.C.G.A. § 10–1–399(c) (Supp.1988), and the court is authorized to award attorney's fees to the injured party. O.C.G.A. § 10–1–399(d) (Supp.1988).

Although the UDTPA and the FBPA seem to be very similar, they are distinct in both scope and relief. Whereas the UDTPA provides only for injunctive relief, the FBPA provides for injunctive relief and the recovery of actual and exemplary damages. But more importantly, the UDTPA is broader in that it allows recovery whenever a person performs a deceptive trade practice "in the course of his business, vocation, or occupation." O.C.G.A. § 10–1–372(a) (1982). On the other hand, if a plaintiff is to recover under the FBPA, he or she must show that the unfair or deceptive act occurred during a consumer transaction, act, or practice in trade or commerce. O.C.G.A. § 10–1–393(a) (Supp. 1988).

■ The court will address first Ms. Sweeney's claim under the UDTPA. To be entitled to relief under this claim, Ms. Sweeney must show that Dr. Mercer's allegedly disparaging statements were made "in the course of [her] business, vocation, or occupation." At this time, the court is of the opinion that a factual question exists as to whether Dr. Mercer made the alleged statements in the course of her vocation as a physician. Although the court sits as a factfinder when considering claims for injunctive relief, this court is not in a position to rule on the UDTPA claim at the summary judgment stage. Accordingly, Ms. Sweeney will be allowed to pursue her UDTPA claim at trial.[13]

___

13. In the instant case, Ms. Sweeney has asserted both legal and equitable claims. The issue of whether Dr. Mercer's statements were made in the course of her occupation as a physician is common to at least some of the legal *and* equitable claims involved in this suit. When one or more issues in a lawsuit are common to both legal and equitable claims, the legal claim should be tried first to preserve the party's right to a jury trial on the common issue. *Dairy Queen, Inc., v. Wood,* 369 U.S. 469, 479, 82 S.Ct.

894, 900–01, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc., v. Westover,* 359 U.S. 500, 510–11, 79 S.Ct. 948, 956–57, 3 L.Ed.2d 988 (1959). Moreover, "[w]hen a party has a right to a jury trial on an issue involved in a legal claim, the judge is of course bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim." *Lincoln v. Bd. of Regents of the Univ. System of Georgia,* 697 F.2d 928, 934 (11th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983). There-

Ms. Sweeney's claim under the FBPA raises different concerns. To recover for a violation of the FBPA, Ms. Sweeney must show that Dr. Mercer's statements were made during a consumer transaction, trade, or practice. An act that does not occur in the conduct of a consumer transaction, trade, or practice, "no matter how unfair or deceptive, is not directly regulated by the FBPA." *State of Georgia v. Meredith Chevrolet, Inc.,* 145 Ga. App. 8, 11–12, 244 S.E.2d 15, 18, *aff'd,* 242 Ga. 294, 249 S.E.2d 87 (1978).

According to Ms. Sweeney's Complaint, Dr. Mercer made the allegedly disparaging statements at ARMC's labor and delivery nurses' station in the presence of several nurses, patients, and other witnesses. Complaint, ¶ 21. During her deposition, Ms. Sweeney testified that Melinda Karnok, one of her nursing students, and Lynn Robinson, a nurse, were the individuals present at the nurses' station at the time the statements were made. Sweeney Dep., pp. 197–98. Ms. Sweeney also testified that one of Dr. Mercer's patients, the patient's husband, another student, and another nurse were in a labor room next to the nurses' station at this same time and could have heard Dr. Mercer's statements. *Id.* at 198–99. Ms. Sweeney contends that since these individuals were potential consumers of her services, Dr. Mercer's statements were made in the conduct of a consumer transaction, act, or practice in trade or commerce.

After carefully considering the Act and those cases construing its language, however, the court disagrees with Ms. Sweeney's contention. The Georgia Court of Appeals has held that "to be subject to direct suit under the FBPA, the alleged offender must have done some volitional act to avail himself of the channels of consumer commerce. The allegedly offensive

activity must have taken place 'in the conduct of [consumer transactions], acts or practices' i.e., within the context of the consumer marketplace." *Meredith Chevrolet,* at 11–12, 244 S.E.2d at 18. The court went on to hold that in determining the context of the alleged offender's activities, two factors are determinative: (1) the medium through which the act or practice is introduced into the stream of commerce; and (2) the market on which the act or practice is reasonably intended to impact. *Id.*

The *Meredith Chevrolet* court set forth an example in which it applied the two-pronged test:

> ... we would find that promotional advertising through a public medium addressed to the consuming public to create a demand for a product, if done in a deceptive manner, would be a violation of the FBPA; advertising in a limited circulation commercial or professional journal, even though deceptive, would not be violative if the medium chosen reasonably restricted the audience (i.e., market) to nonconsumers, even though the product so advertised were eventually to reach the hands of consumers.

*Id.* The medium used in the instant case was a conversation between Dr. Mercer and Ms. Sweeney at the ARMC nurses' station. Ms. Sweeney was not a consumer, and the conversation between her and Dr. Mercer was not a consumer transaction, act, or practice in trade or commerce. Dr. Mercer was not selling any goods or services to Ms. Sweeney, nor was Ms. Sweeney purchasing any goods or services from Dr. Mercer. Simply stated, the conversation took place outside the context of consumer commerce, and therefore, the statements do not fall within the regulatory authority of the FBPA.[14]

fore, if the jury must decide the factual issue of whether Dr. Mercer made her statements in the course of her occupation during their deliberations on one of the legal claims involved in this suit, then the court would be bound by that finding in connection with its ruling on the UDTPA claim.

14. The court notes an additional reason for granting summary judgment to AWC and its doctors on Ms. Sweeney's FBPA claim. Under the FBPA, a claimant who either maintains a place of business in this State or keeps assets within this State must give the defendant notice of a potential FBPA claim at least 30 days prior to filing an action under the FBPA. O.C.G.A. § 10–1–399(b) (1982). The notice must set forth

For these reasons, summary judgment is GRANTED IN PART AND DENIED IN PART to AWC and its doctors on Count V of Ms. Sweeney's Complaint. Ms. Sweeney is allowed to pursue her UDTPA claim, but the court finds that she has failed to state a cause of action under the FBPA.

## IV. CONCLUSION

In sum, the court hereby GRANTS summary judgment in favor of AWC, AO & G, and the Defendant doctors on Count IV of the Complaint. Further, the court GRANTS summary judgment in favor of AWC and its doctors on the Fair Business Practices Act claim asserted in Count V of the Complaint. Finally, summary judgment is hereby DENIED to AWC, AO & G, and the Defendant doctors on Counts I, II, VI, and VII of the Complaint, and summary judgment is DENIED to AWC and its doctors on the Uniform Deceptive Trade Practices Act claim raised in Count V of the Complaint.

---

a written demand for relief, identify the claimant, and reasonably describe the unfair or deceptive act or practice and the injury suffered. *Id.* Ms. Sweeney has produced no evidence showing that she delivered a written demand to these Defendants at least 30 days prior to filing this action. Consequently, Ms. Sweeney has failed to show that she fulfilled the statutory requirements for bringing an action under the FBPA.